# UNITED STATES *v.* CALIFORNIA.

## NO. 12, ORIGINAL.

Argued March 13–14, 1947.—Decided June 23, 1947.*

---

*For order and decree entered October 27, 1947, see *post,* p. 804.

20

*Attorney General Clark* and *J. Howard McGrath,* then Solicitor General, were for the United States on the motion

for leave to file the complaint, and on the complaint and other pleadings, including a motion for judgment on the pleadings.

*Robert W. Kenny,* then Attorney General of California, was for the defendant on its answer and other pleadings.

*Attorney General Clark* and *Arnold Raum* argued the cause for the United States. With them on the brief were *Acting Solicitor General Washington, Assistant Attorney General Bazelon, Stanley M. Silverberg, J. Edward Williams, Robt. E. Mulroney, Robert M. Vaughan, Abraham J. Harris* and *Thomas L. McKevitt.*

*Fred N. Howser,* Attorney General of California, and *William W. Clary,* Assistant Attorney General, argued the cause for the defendant. With them on the brief were *C. Roy Smith,* Assistant Attorney General, *Homer Cummings, Max O'Rell Truitt, Louis W. Myers* and *Jackson W. Chance.*

By special leave of Court, *Price Daniel,* Attorney General of Texas, argued the cause for the National Association of Attorneys General, as *amicus curiae,* urging dismissal of the complaint. With him on the brief were *Walter R. Johnson,* Attorney General of Nebraska; *Clarence A. Barnes,* Attorney General of Massachusetts, *Nathan B. Bidwell* and *George P. Drury,* Assistant Attorneys General; *Hugh S. Jenkins,* Attorney General of Ohio; *Fred S. LeBlanc,* Attorney General of Louisiana, and *John L. Madden,* Special Assistant Attorney General; *Edward F. Arn,* Attorney General of Kansas; *A. B. Mitchell; Elton M. Hyder, Jr.,* Assistant Attorney General of Texas; *Grover Sellers* and *Orrin G. Judd.*

By special leave of Court, *Leander I. Shelley* argued the cause for the American Association of Port Authorities, as

22

*amicus curiae,* urging dismissal of the complaint. With him on the brief were *Eldon S. Lazarus* and *Reuben Satterthwaite.*

*James E. Watson* and *Orin deM. Walker* filed a brief for Robert E. Lee Jordan, as *amicus curiae,* in support of the United States.

Briefs of *amici curiae* in support of the defendant were filed by *Nathaniel L. Goldstein,* Attorney General, and *Wendell P. Brown,* Solicitor General, for the State of New York; *T. McKeen Chidsey,* Attorney General, *M. Vashti Burr,* Deputy Attorney General, and *Harry F. Stambaugh* for the Commonwealth of Pennsylvania; *Herman C. Wilson, Horace H. Edward, Walter J. Mattison, Ray L. Chesebro* and *Charles S. Rhyne* for the National Institute of Municipal Law Officers; *Ray L. Chesebro, W. Reginald Jones, Irving M. Smith* and *Hugh H. MacDonald,* for the California Association of Port Authorities; *Archibald N. Jordan* for the Lawrence Wards Island Realty Co.; and *A. L. Weil* and *Thomas A. J. Dockweiler.*

MR. JUSTICE BLACK delivered the opinion of the Court.

The United States by its Attorney General and Solicitor General brought this suit against the State of California invoking our original jurisdiction under Article III, § 2, of the Constitution which provides that "In all Cases . . . in which a State shall be Party, the supreme Court shall have original Jurisdiction." The complaint alleges that the United States "is the owner in fee simple of, or possessed of paramount rights in and powers over, the lands, minerals and other things of value underlying the Pacific Ocean, lying seaward of the ordinary low water mark on the coast of California and outside of the inland waters of the State, extending seaward three nautical miles and bounded on the north and south, respectively, by the

northern and southern boundaries of the State of California." It is further alleged that California, acting pursuant to state statutes, but without authority from the United States, has negotiated and executed numerous leases with persons and corporations purporting to authorize them to enter upon the described ocean area to take petroleum, gas, and other mineral deposits, and that the lessees have done so, paying to California large sums of money in rents and royalties for the petroleum products taken. The prayer is for a decree declaring the rights of the United States in the area as against California and enjoining California and all persons claiming under it from continuing to trespass upon the area in violation of the rights of the United States.

California has filed an answer to the complaint. It admits that persons holding leases from California, or those claiming under it, have been extracting petroleum products from the land under the three-mile ocean belt immediately adjacent to California. The basis of California's asserted ownership is that a belt extending three English miles from low water mark lies within the original boundaries of the state, Cal. Const. Art. XII (1849); [1] that the original thirteen states acquired from the Crown of England title to all lands within their boundaries under navigable waters, including a three-mile belt in adjacent seas; and that since California was admitted as a state on an "equal footing" with the original states, California at that time became vested with title to all such lands. The answer further sets up several "affirmative" defenses. Among these are that California should be adjudged to

---

[1] The Government complaint claims an area extending three nautical miles from shore; the California boundary purports to extend three English miles. One nautical mile equals 1.15 English miles, so that there is a difference of .45 of an English mile between the boundary of the area claimed by the Government, and the boundary of California. See Cal. Const. Art. XXI, § 1 (1879).

have title under a doctrine of prescription; because of an alleged long-existing Congressional policy of acquiescence in California's asserted ownership; because of estoppel or laches; and, finally, by application of the rule of *res judicata*.[2]

After California's answer was filed, the United States moved for judgment as prayed for in the complaint on the ground that the purported defenses were not sufficient in law. The legal issues thus raised have been exhaustively presented by counsel for the parties, both by brief and oral argument. Neither has suggested any necessity for the introduction of evidence, and we perceive no such necessity at this stage of the case. It is now ripe for determination of the basic legal issues presented by the motion. But before reaching the merits of these issues, we must first consider questions raised in California's brief and oral argument concerning the Government's right to an adjudication of its claim in this proceeding.

*First.* It is contended that the pleadings present no case or controversy under Article III, § 2, of the Constitution. The contention rests in the first place on an argument that there is no case or controversy in a legal sense, but only a difference of opinion between federal and state officials. It is true that there is a difference of opinion between federal and state officers. But there is far more than that. The point of difference is as to who owns, or has paramount rights in and power over several thousand square miles of

---

[2] The claim of *res judicata* rests on the following contention. The United States sued in ejectment for certain lands situated in San Francisco Bay. The defendant held the lands under a grant from California. This Court decided that the state grant was valid because the land under the Bay had passed to the state upon its admission to the Union. *United States* v. *Mission Rock Co.*, 189 U. S. 391. There may be other reasons why the judgment in that case does not bar this litigation; but it is a sufficient reason that this case involves land under the open sea, and not land under the inland waters of San Francisco Bay.

land under the ocean off the coast of California. The difference involves the conflicting claims of federal and state officials as to which government, state or federal, has a superior right to take or authorize the taking of the vast quantities of oil and gas underneath that land, much of which has already been, and more of which is about to be, taken by or under authority of the state. Such concrete conflicts as these constitute a controversy in the classic legal sense, and are the very kind of differences which can only be settled by agreement, arbitration, force, or judicial action. The case principally relied upon by California, *United States* v. *West Virginia,* 295 U. S. 463, does not support its contention. For here there is a claim by the United States, admitted by California, that California has invaded the title or paramount right asserted by the United States to a large area of land and that California has converted to its own use oil which was extracted from that land. *Cf. United States* v. *West Virginia, supra,* 471. This alone would sufficiently establish the kind of concrete, actual conflict of which we have jurisdiction under Article III. The justiciability of this controversy rests therefore on conflicting claims of alleged invasions of interests in property and on conflicting claims of governmental powers to authorize its use. *United States* v. *Texas,* 143 U. S. 621, 646, 648; *United States* v. *Minnesota,* 270 U. S. 181, 194; *Nebraska* v. *Wyoming,* 325 U. S. 589, 608.

Nor can we sustain that phase of the state's contention as to the absence of a case or controversy resting on the argument that it is impossible to identify the subject matter of the suit so as to render a proper decree. The land claimed by the Government, it is said, has not been sufficiently described in the complaint since the only shoreward boundary of some segments of the marginal belt is the line between that belt and the State's inland waters. And the Government includes in the term "in-

26

land waters" ports, harbors, bays, rivers, and lakes. Pointing out the numerous difficulties in fixing the point where these inland waters end and the marginal sea begins, the state argues that the pleadings are therefore wholly devoid of a basis for a definite decree, the kind of decree essential to disposition of a case like this. Therefore, California concludes, all that is prayed for is an abstract declaration of rights concerning an unidentified three-mile belt, which could only be used as a basis for subsequent actions in which specific relief could be granted as to particular localities.

We may assume that location of the exact coastal line will involve many complexities and difficulties. But that does not make this any the less a justiciable controversy. Certainly demarcation of the boundary is not an impossibility. Despite difficulties this Court has previously adjudicated controversies concerning submerged land boundaries. See *New Jersey* v. *Delaware,* 291 U. S. 361, 295 U. S. 694; *Borax, Ltd.* v. *Los Angeles,* 296 U. S. 10, 21–27; *Oklahoma* v. *Texas,* 256 U. S. 70, 602. And there is no reason why, after determining in general who owns the three-mile belt here involved, the Court might not later, if necessary, have more detailed hearings in order to determine with greater definiteness particular segments of the boundary. *Oklahoma* v. *Texas,* 258 U. S. 574, 582. Such practice is commonplace in actions similar to this which are in the nature of equitable proceedings. See *e. g. Oklahoma* v. *Texas,* 256 U. S. 602, 608–609; 260 U. S. 606, 625, 261 U. S. 340. California's contention concerning the indefiniteness of the claim presents no insuperable obstacle to the exercise of the highly important jurisdiction conferred on us by Article III of the Constitution.

*Second.* It is contended that we should dismiss this action on the ground that the Attorney General has not been granted power either to file or to maintain it. It is

not denied that Congress has given a very broad authority to the Attorney General to institute and conduct litigation in order to establish and safeguard government rights and properties.[3]  The argument is that Congress has for a long period of years acted in such a way as to manifest a clear policy to the effect that the states, not the Federal Government, have legal title to the land under the three-mile belt.  Although Congress has not expressly declared such a policy, we are asked to imply it from certain conduct of Congress and other governmental agencies charged with responsibilities concerning the national domain. And, in effect, we are urged to infer that Congress has by implication amended its long-existing statutes which grant the Attorney General broad powers to institute and maintain court proceedings in order to safeguard national interests.

An Act passed by Congress and signed by the President could, of course, limit the power previously granted the Attorney General to prosecute claims for the Government. For Article IV, § 3, Cl. 2 of the Constitution vests in Congress "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."  We have said that the constitutional power of Congress in this respect is without limitation.  *United States* v. *San Francisco,* 310 U. S. 16, 29–30.  Thus neither the courts nor the executive agencies could proceed contrary to an Act of Congress in this congressional area of national power.

But no Act of Congress has amended the statutes which impose on the Attorney General the authority and the duty to protect the Government's interests through the

---

[3] 5 U. S. C. §§ 291, 309; *United States* v. *San Jacinto Tin Co.,* 125 U. S. 273, 279, 284; *Kern River Co.* v. *United States,* 257 U. S. 147, 154–55; *Sanitary District* v. *United States,* 266 U. S. 405, 425–426; see also *In re Debs,* 158 U. S. 564, 584; *United States* v. *Oregon,* 295 U. S. 1, 24; *United States* v. *Wyoming,* 323 U. S. 669, 329 U. S. 670.

28

courts. See *In re Cooper,* 143 U. S. 472, 502–503. That Congress twice failed to grant the Attorney General specific authority to file suit against California,[4] is not a sufficient basis upon which to rest a restriction of the Attorney General's statutory authority. And no more can we reach such a conclusion because both Houses of Congress passed a joint resolution quitclaiming to the adjacent states a three-mile belt of all land situated under the ocean beyond the low water mark, except those which the Government had previously acquired by purchase, condemnation, or donation.[5] This joint resolution was vetoed by the President.[6] His veto was sustained.[7] Plainly, the resolution does not represent an exercise of the constitutional power of Congress to dispose of public property under Article IV, § 3, Cl. 2.

Neither the matters to which we have specifically referred, nor any others relied on by California, afford support for a holding that Congress has either explicitly or by implication stripped the Attorney General of his statu-

[4] S. J. Res. 208, 75th Cong., 1st Sess. (1937) ; S. J. Res. 83 and 92, 76th Cong., 1st Sess. (1939). S. J. Res. 208 passed the Senate, 81 Cong. Rec. 9326 (1937), was favorably reported by the House Judiciary Committee, H. R. Rep. 2378, 75th Cong., 3d Sess (1938), but was never acted on in the House. Hearings were held on S. J. Res. 83 and 92 before the Senate Committee on Public Lands and Surveys, but no further action was taken. *Hearings before the Senate Committee on Public Lands and Surveys on S. J. Res. 83 and 92,* 76th Cong., 1st Sess. (1939). In both hearings objections to the resolutions were repeatedly made on the ground that passage of the resolutions was unnecessary since the Attorney General already had statutory authority to institute the proceedings. See *Hearing before the House Committee on the Judiciary on S. J. Res. 208,* 75th Cong., 3d Sess., 42–45, 59–61 (1938); *Hearings on S. J. Res. 83 and 92, supra,* 27–30.

[5] H. J. Res. 225, 79th Cong., 2d Sess. (1946) ; 92 Cong. Rec. 9642, 10316 (1946).

[6] 92 Cong. Rec. 10660 (1946).

[7] 92 Cong. Rec. 10745 (1946).

torily granted power to invoke our jurisdiction in this federal-state controversy. This brings us to the merits of the case.

*Third.* The crucial question on the merits is not merely who owns the bare legal title to the lands under the marginal sea. The United States here asserts rights in two capacities transcending those of a mere property owner. In one capacity it asserts the right and responsibility to exercise whatever power and dominion are necessary to protect this country against dangers to the security and tranquility of its people incident to the fact that the United States is located immediately adjacent to the ocean. The Government also appears in its capacity as a member of the family of nations. In that capacity it is responsible for conducting United States relations with other nations. It asserts that proper exercise of these constitutional responsibilities requires that it have power, unencumbered by state commitments, always to determine what agreements will be made concerning the control and use of the marginal sea and the land under it. See *McCulloch* v. *Maryland,* 4 Wheat. 316, 403–408; *United States* v. *Minnesota,* 270 U. S. 181, 194. In the light of the foregoing, our question is whether the state or the Federal Government has the paramount right and power to determine in the first instance when, how, and by what agencies, foreign or domestic, the oil and other resources of the soil of the marginal sea, known or hereafter discovered, may be exploited.

California claims that it owns the resources of the soil under the three-mile marginal belt as an incident to those elements of sovereignty which it exercises in that water area. The state points out that its original Constitution, adopted in 1849 before that state was admitted to the Union, included within the state's boundary the water area extending three English miles from the shore, Cal. Const. (1849) Art. XII; that the Enabling Act which

30

admitted California to the Union ratified the territorial boundary thus defined; and that California was admitted "on an equal footing with the original States in all respects whatever," 9 Stat. 452. With these premises admitted, California contends that its ownership follows from the rule originally announced in *Pollard's Lessee* v. *Hagan,* 3 How. 212; see also *Martin* v. *Waddell,* 16 Pet. 367, 410. In the *Pollard* case it was held, in effect, that the original states owned in trust for their people the navigable tidewaters between high and low water mark within each state's boundaries, and the soil under them, as an inseparable attribute of state sovereignty. Consequently, it was decided that Alabama, because admitted into the Union on "an equal footing" with the other states, had thereby become the owner of the tidelands within its boundaries. Thus the title of Alabama's tidelands grantee was sustained as valid against that of a claimant holding under a United States grant made subsequent to Alabama's admission as a state.

The Government does not deny that under the *Pollard* rule, as explained in later cases,[8] California has a qualified ownership [9] of lands under inland navigable waters such as rivers, harbors, and even tidelands down to the low water mark. It does question the validity of the rationale in the *Pollard* case that ownership of such water areas, any

---

[8] See *e. g., Manchester* v. *Massachusetts,* 139 U. S. 240; *Louisiana* v. *Mississippi,* 202 U. S. 1; *The Abby Dodge,* 223 U. S. 166. See also *United States* v. *Mission Rock Co.,* 189 U. S. 391; *Borax, Ltd.* v. *Los Angeles,* 296 U. S. 10.

Although the *Pollard* case has thus been generally approved many times, the case of *Shively* v. *Bowlby,* 152 U. S. 1, 47–48, 58, held, contrary to implications of the *Pollard* opinion, that the United States could lawfully dispose of tidelands while holding a future state's land "in trust" as a territory.

[9] See *United States* v. *Commodore Park,* 324 U. S. 386, 390, 391; *Scranton* v. *Wheeler,* 179 U. S. 141, 159, 160, 163; *Stockton* v. *Baltimore & N. Y. R. Co.,* 32 F. 9, 20; see also *United States* v. *Chandler-Dunbar Co.,* 229 U. S. 53.

more than ownership of uplands, is a necessary incident of the state sovereignty contemplated by the "equal footing" clause. *Cf. United States* v. *Oregon,* 295 U. S. 1, 14. For this reason, among others, it argues that the *Pollard* rule should not be extended so as to apply to lands under the ocean. It stresses that the thirteen original colonies did not own the marginal belt; that the Federal Government did not seriously assert its increasingly greater rights in this area until after the formation of the Union; that it has not bestowed any of these rights upon the states, but has retained them as appurtenances of national sovereignty. And the Government insists that no previous case in this Court has involved or decided conflicting claims of a state and the Federal Government to the three-mile belt in a way which requires our extension of the *Pollard* inland water rule to the ocean area.

It would unduly prolong our opinion to discuss in detail the multitude of references to which the able briefs of the parties have cited us with reference to the evolution of powers over marginal seas exercised by adjacent countries. From all the wealth of material supplied, however, we cannot say that the thirteen original colonies separately acquired ownership to the three-mile belt or the soil under it,[10] even if they did acquire elements of the sovereignty of the English Crown by their revolution against it. *Cf. United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304, 316.

---

[10] A representative collection of official documents and scholarship on the subject is Crocker, The Extent of the Marginal Sea (1919). See also I Azuni, Maritime Law of Europe (published 1806) c. II; Fulton, Sovereignty of the Sea (1911); Masterson, Jurisdiction in Marginal Seas (1929); Jessup, The Law of Territorial Waters and Maritime Jurisdiction (1927); Fraser, *The Extent and Delimitation of Territorial Waters,* 11 Corn. L. Q. 455 (1926); Ireland, *Marginal Seas Around the States,* 2 La. L. Rev. 252, 436 (1940); Comment, *Conflicting State and Federal Claims of Title in Submerged Lands of the Continental Shelf,* 56 Yale L. J. 356 (1947).

32

At the time this country won its independence from England there was no settled international custom or understanding among nations that each nation owned a three-mile water belt along its borders. Some countries, notably England, Spain, and Portugal, had, from time to time, made sweeping claims to a right of dominion over wide expanses of ocean. And controversies had arisen among nations about rights to fish in prescribed areas.[11] But when this nation was formed, the idea of a three-mile belt over which a littoral nation could exercise rights of ownership was but a nebulous suggestion.[12] Neither the English charters granted to this nation's settlers,[13] nor the treaty of peace with England,[14] nor any other document to which we have been referred, showed a purpose to set apart a three-mile ocean belt for colonial or state ownership.[15] Those who settled this country were interested in lands upon which to live, and waters upon which to fish and sail. There is no substantial support in history for the idea that they wanted or claimed a right to block off

[11] See, *e. g.*, Fulton, *op. cit. supra*, 3–19, 144–145; Jessup, *op. cit. supra*, 4.

[12] Fulton, *op. cit. supra*, 21, says in fact that "mainly through the action and practice of the United States of America and Great Britain since the end of the eighteenth century, the distance of three miles from shore was more or less formally adopted by most maritime states as . . . more definitely fixing the limits of their jurisdiction and rights for various purposes, and, in particular, for exclusive fishery."

[13] Collected in Thorpe, Federal and State Constitutions (1909).

[14] Treaty of 1783, 8 Stat. 80.

[15] The Continental Congress did for example authorize capture of neutral and even American ships carrying British goods, "if found within three leagues [about nine miles] of the coasts." Journ. of Cong. 185, 186, 187 (1781). *Cf.* Declaration of Panama of 1939, 1 Dept. of State Bull. 321 (1939), claiming the right of the American Republics to be free from a hostile act in a zone 300 miles from the American coasts.

the ocean's bottom for private ownership and use in the extraction of its wealth.

It did happen that shortly after we became a nation our statesmen became interested in establishing national dominion over a definite marginal zone to protect our neutrality.[16]    Largely as a result of their efforts, the idea of a definite three-mile belt in which an adjacent nation can, if it chooses, exercise broad, if not complete dominion, has apparently at last been generally accepted throughout the world,[17] although as late as 1876 there was still considerable doubt in England about its scope and even its existence.    See *The Queen* v. *Keyn,* 2 Ex. D. 63.    That the political agencies of this nation both claim and exercise broad dominion and control over our three-mile marginal belt is now a settled fact. *Cunard Steamship Co.* v. *Mellon,* 262 U. S. 100, 122–124.[18]

---

[16] Secretary of State Jefferson in a note to the British minister in 1793 pointed to the nebulous character of a nation's assertions of territorial rights in the marginal belt, and put forward the first official American claim for a three-mile zone which has since won general international acceptance.    Reprinted in H. Ex. Doc. No. 324, 42d Cong., 2d Sess. (1872) 553–554.    See also Secretary Jefferson's note to the French Minister, Genet, reprinted American State Papers, I Foreign Relations (1833), 183, 184; Act of June 5, 1794, 1 Stat. 381; 1 Kent, Commentaries, 14th Ed., 33–40.

[17] See Jessup, *op. cit. supra,* 66; *Research in International Law,* 23 A. J. I. L. 249, 250 (Spec. Supp. 1929).

[18] See also *Church* v. *Hubbart,* 2 Cranch 187, 234.    Congressional assertion of a territorial zone in the sea appears in statutes regulating seals, fishing, pollution of waters, etc.    36 Stat. 326, 328; 43 Stat. 604, 605; 37 Stat. 499, 501.    Under the National Prohibition Act, territory including "a marginal belt of the sea extending from low-water mark outward a marine league, or 3 geographical miles" constituting the "territorial waters of the United States" was regulated. See U. S. Treas. Reg. 2, § 2201 (1927), reprinted in *Research in International Law, supra,* 250; 41 Stat. 305.    Anti-smuggling treaties in which foreign nations agreed to permit the United States to pursue smugglers beyond the three-mile limit contained express stipulations

And this assertion of national dominion over the three-mile belt is binding upon this Court. See *Jones* v. *United States,* 137 U. S. 202, 212–214; *In re Cooper,* 143 U. S. 472, 502–503.

Not only has acquisition, as it were, of the three-mile belt been accomplished by the National Government, but protection and control of it has been and is a function of national external sovereignty. See *Jones* v. *United States,* 137 U. S. 202; *In re Cooper,* 143 U. S. 472, 502. The belief that local interests are so predominant as constitutionally to require state dominion over lands under its land-locked navigable waters finds some argument for its support. But such can hardly be said in favor of state control over any part of the ocean or the ocean's bottom. This country, throughout its existence has stood for freedom of the seas, a principle whose breach has precipitated wars among nations. The country's adoption of the three-mile belt is by no means incompatible with its traditional insistence upon freedom of the sea, at least so long as the national Government's power to exercise control consistently with whatever international undertakings or commitments it may see fit to assume in the national interest

that generally the three-mile limit constitutes "the proper limits of territorial waters." See *e. g.,* 43 Stat. 1761 (Pt. 2).

There are innumerable executive declarations to the world of our national claims to the three-mile belt, and more recently to the whole continental shelf. For references to diplomatic correspondence making these assertions, see 1 Moore, International Law Digest (1906) 705, 706, 707; 1 Wharton, Digest of International Law (1886) 100. See also Hughes, *Recent Questions and Negotiations,* 18 A. J. I. L. 229 (1924).

The latest and broadest claim is President Truman's recent proclamation that the United States "regards the natural resources of the subsoil and sea bed of the continental shelf beneath the high seas but contiguous to the coasts of the United States as appertaining to the United States, subject to its jurisdiction and control. . . ." Exec. Proc. 2667, Sept. 28, 1945, 10 F. R. 12303.

is unencumbered. See *Hines* v. *Davidowitz,* 312 U. S. 52, 62–64; *McCulloch* v. *Maryland, supra.* The three-mile rule is but a recognition of the necessity that a government next to the sea must be able to protect itself from dangers incident to its location. It must have powers of dominion and regulation in the interest of its revenues, its health, and the security of its people from wars waged on or too near its coasts. And insofar as the nation asserts its rights under international law, whatever of value may be discovered in the seas next to its shores and within its protective belt, will most naturally be appropriated for its use. But whatever any nation does in the open sea, which detracts from its common usefulness to nations, or which another nation may charge detracts from it,[19] is a question for consideration among nations as such, and not their separate governmental units. What this Government does, or even what the states do, anywhere in the ocean, is a subject upon which the nation may enter into and assume treaty or similar international obligations. See *United States* v. *Belmont,* 301 U. S. 324, 331– 332. The very oil about which the state and nation here contend might well become the subject of international dispute and settlement.

The ocean, even its three-mile belt, is thus of vital consequence to the nation in its desire to engage in commerce and to live in peace with the world; it also becomes of crucial importance should it ever again become impossible to preserve that peace. And as peace and world commerce are the paramount responsibilities of the nation, rather than an individual state, so, if wars come, they must be fought by the nation. See *Chy Lung* v. *Freeman,* 92 U. S. 275, 279. The state is not equipped in our constitutional system with the powers or the facilities for exercising the responsibilities which would be concomitant with

[19] See *Lord* v. *Steamship Co.,* 102 U. S. 541, 544.

36

the dominion which it seeks. Conceding that the state has been authorized to exercise local police power functions in the part of the marginal belt within its declared boundaries,[20] these do not detract from the Federal Government's paramount rights in and power over this area. Consequently, we are not persuaded to transplant the *Pollard* rule of ownership as an incident of state sovereignty in relation to inland waters out into the soil beneath the ocean, so much more a matter of national concern. If this rationale of the *Pollard* case is a valid basis for a conclusion that paramount rights run to the states in inland waters to the shoreward of the low water mark, the same rationale leads to the conclusion that national interests, responsibilities, and therefore national rights are paramount in waters lying to the seaward in the three-mile belt. *Cf. United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304, 316; *United States* v. *Causby,* 328 U. S. 256.

As previously stated, this Court has followed and reasserted the basic doctrine of the *Pollard* case many times. And in doing so it has used language strong enough to indicate that the Court then believed that states not only owned tidelands and soil under navigable inland waters, but also owned soils under all navigable waters within their territorial jurisdiction, whether inland or not. All of these statements were, however, merely paraphrases or offshoots of the *Pollard* inland-water rule, and were used, not as enunciation of a new ocean rule, but in explanation of the old inland-water principle. Notwithstanding the fact that none of these cases either involved or decided the state-federal conflict presented here, we are urged to say that the language used and repeated in those cases fore-

[20] See *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 404; *cf. The Abby Dodge,* 223 U. S. 166, with *Skiriotes* v. *Florida,* 313 U. S. 69, 74–75.

closes the Government from the right to have this Court decide that question now that it is squarely presented for the first time.

There are three such cases whose language probably lends more weight to California's argument than any others. The first is *Manchester* v. *Massachusetts,* 139 U. S. 240. That case involved only the power of Massachusetts to regulate fishing. Moreover, the illegal fishing charged was in Buzzards Bay, found to be within Massachusetts territory, and no question whatever was raised or decided as to title or paramount rights in the open sea. And the Court specifically laid to one side any question as to the rights of the Federal Government to regulate fishing there. The second case, *Louisiana* v. *Mississippi,* 202 U. S. 1, 52, uses language about "the sway of the riparian States" over "maritime belts." That was a case involving the boundary between Louisiana and Mississippi. It did not involve any dispute between the federal and state governments. And the Court there specifically laid aside questions concerning "the breadth of the maritime belt or the extent of the sway of the riparian States . . . ." *Id.* at 52. The third case is *The Abby Dodge,* 223 U. S. 166. That was an action against a ship landing sponges at a Florida port in violation of an Act of Congress, 34 Stat. 313, which made it unlawful to "land" sponges taken under certain conditions from the waters of the Gulf of Mexico. This Court construed the statute's prohibition as applying only to sponges outside the state's "territorial limits" in the Gulf. It thus narrowed the scope of the statute because of a belief that the United States was without power to regulate the Florida traffic in sponges obtained from within Florida's territorial limits, presumably the three-mile belt. But the opinion in that case was concerned with the state's power to regulate and conserve within its territorial waters, not with its exercise of the right to use and deplete

resources which might be of national and international importance. And there was no argument there, nor did this Court decide, whether the Federal Government owned or had paramount rights in the soil under the Gulf waters. That this question remained undecided is evidenced by *Skiriotes* v. *Florida,* 313 U. S. 69, 75, where we had occasion to speak of Florida's power over sponge-fishing in its territorial waters. Through Mr. Chief Justice Hughes we said: "It is also clear that Florida has an interest in the proper maintenance of the sponge fishery and that the [state] statute *so far as applied to conduct within the territorial waters of Florida, in the absence of conflicting federal legislation, is within the police power of the State."* (Emphasis supplied.)

None of the foregoing cases, nor others which we have decided, are sufficient to require us to extend the *Pollard* inland-water rule so as to declare that California owns or has paramount rights in or power over the three-mile belt under the ocean. The question of who owned the bed of the sea only became of great potential importance at the beginning of this century when oil was discovered there.[21] As a consequence of this discovery, California passed an Act in 1921 authorizing the granting of permits to California residents to prospect for oil and gas on blocks of land off its coast under the ocean. Cal. Stats. 1921, c. 303. This state statute, and others which followed it, together with the leasing practices under them, have precipitated this extremely important controversy, and pointedly raised this state-federal conflict for the first time. Now that the question is here, we decide for the reasons we have stated that California is not the owner of the three-mile marginal belt along its coast, and that the Federal Government rather than the state has paramount rights in and power over that belt, an incident to

---

[21] Bull. No. 321, Dept. of Interior, Geological Survey.

which is full dominion over the resources of the soil under that water area, including oil.

*Fourth.* Nor can we agree with California that the Federal Government's paramount rights have been lost by reason of the conduct of its agents. The state sets up such a defense, arguing that by this conduct the Government is barred from enforcing its rights by reason of principles similar to laches, estoppel or adverse possession. It would serve no useful purpose to recite the incidents in detail upon which the state relies for these defenses. Some of them are undoubtedly consistent with a belief on the part of some Government agents at the time that California owned all, or at least a part of the three-mile belt. · This belief was indicated in the substantial number of instances in which the Government acquired title from the states to lands located in the belt; some decisions of the Department of Interior have denied applications for federal oil and gas leases in the California coastal belt on the ground that California owned the lands. Outside of court decisions following the *Pollard* rule, the foregoing are the types of conduct most nearly indicative of waiver upon which the state relies to show that the Government has lost its paramount rights in the belt. Assuming that Government agents could by conduct, short of a congressional surrender of title or interest, preclude the Government from asserting its legal rights, we cannot say it has done so here. As a matter of fact, the record plainly demonstrates that until the California oil issue began to be pressed in the thirties, neither the states nor the Government had reason to focus attention on the question of which of them owned or had paramount rights in or power over the three-mile belt. And even assuming that Government agencies have been negligent in failing to recognize or assert the claims of the Government at an earlier date, the great interests of the Government in this ocean

40

area are not to be forfeited as a result. The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act.[22]

We have not overlooked California's argument, buttressed by earnest briefs on behalf of other states, that improvements have been made along and near the shores at great expense to public and private agencies. And we note the Government's suggestion that the aggregate value of all these improvements are small in comparison with the tremendous value of the entire three-mile belt here in controversy. But however this may be, we are faced with the issue as to whether state or nation has paramount rights in and power over this ocean belt, and that great national question is not dependent upon what expenses may have been incurred upon mistaken assumptions. Furthermore, we cannot know how many of these improvements are within and how many without the boundary of the marginal sea which can later be accurately defined. But beyond all this we cannot and do not assume that Congress, which has constitutional control over Government property, will execute its powers in such way as to bring about injustices to states, their subdivisions, or persons acting pursuant to their permission. See *United States* v. *Texas,* 162 U. S. 1, 89, 90; *Lee Wilson & Co.* v. *United States,* 245 U. S. 24, 32.

---

[22] *United States* v. *San Francisco,* 310 U. S. 16, 31–32; *Utah* v. *United States,* 284 U. S. 534, 545, 546; *Lee Wilson & Co.* v. *United States,* 245 U. S. 24, 32; *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 409. See also *Sec'y of State for India* v. *Chelikani Rama Rao,* L. R. 43 Indian App. 192, 204 (1916).

We hold that the United States is entitled to the relief prayed for. The parties, or either of them, may, before September 15, 1947, submit the form of decree to carry this opinion into effect, failing which the Court will prepare and enter an appropriate decree at the next term of Court.

*It is so ordered.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE REED, dissenting.

In my view the controversy brought before this Court by the complaint of the United States against California seeks a judgment between State and Nation as to the ownership of the land underlying the Pacific Ocean, seaward of the ordinary low water mark, on the coast of California and within the three-mile limit. The ownership of that land carries with it, it seems to me, the ownership of any minerals or other valuables in the soil, as well as the right to extract them.

The determination as to the ownership of the land in controversy turns for me on the fact as to ownership in the original thirteen states of similar lands prior to the formation of the Union. If the original states owned the bed of the sea, adjacent to their coasts, to the three-mile limit, then I think California has the same title or ownership to the lands adjacent to her coast. The original states were sovereignties in their own right, possessed of so much of the land underneath the adjacent seas as was generally recognized to be under their jurisdiction. The scope of their jurisdiction and the boundaries of their lands were coterminous. Any part of that territory which had not passed from their ownership by existing valid grants were and remained public lands of the respective states. California, as is customary, was admitted into

42

the Union "on an equal footing with the original States in all respects whatever." 9 Stat. 452. By § 3 of the Act of Admission, the public lands within its borders were reserved for disposition by the United States. "Public lands" was there used in its usual sense of lands subject to sale under general laws. As was the rule, title to lands under navigable waters vested in California as it had done in all other states. *Pollard* v. *Hagan,* 3 How. 212; *Barney* v. *Keokuk,* 94 U. S. 324, 338; *Shively* v. *Bowlby,* 152 U. S. 1, 49; *Mann* v. *Tacoma Land Co.,* 153 U. S. 273, 284; *Borax Consolidated, Ltd.* v. *Los Angeles,* 296 U. S. 10, 17.

The authorities cited in the Court's opinion lead me to the conclusion that the original states owned the lands under the seas to the three-mile limit. There were, of course, as is shown by the citations, variations in the claims of sovereignty, jurisdiction or ownership among the nations of the world. As early as 1793, Jefferson as Secretary of State, in a communication to the British Minister, said that the territorial protection of the United States would be extended "three geographical miles" and added:

> "This distance can admit of no opposition, as it is recognized by treaties between some of the powers with whom we are connected in commerce and navigation, and is as little, or less, than is claimed by any of them on their own coasts." H. Ex. Doc. No. 324, 42d Cong., 2d Sess., pp. 553–54.

If the original states did claim, as I think they did, sovereignty and ownership to the three-mile limit, California has the same rights in the lands bordering its littoral.

This ownership in California would not interfere in any way with the needs or rights of the United States in war or peace. The power of the United States is plenary over these undersea lands precisely as it is over every

river, farm, mine, and factory of the nation. While no square ruling of this Court has determined the ownership of those marginal lands, to me the tone of the decisions dealing with similar problems indicates that, without discussion, state ownership has been assumed. *Pollard* v. *Hagan, supra; Louisiana* v. *Mississippi,* 202 U. S. 1, 52; *The Abby Dodge,* 223 U. S. 166; *New Jersey* v. *Delaware,* 291 U. S. 361; 295 U. S. 694.

MR. JUSTICE FRANKFURTER, dissenting.

By this original bill the United States prayed for a decree enjoining all persons, including those asserting a claim derived from the State of California, from trespassing upon the disputed area. An injunction against trespassers normally presupposes property rights. The Court, however, grants the prayer but does not do so by finding that the United States has proprietary interests in the area. To be sure, it denies such proprietary rights in California. But even if we assume an absence of ownership or possessory interest on the part of California, that does not establish a proprietary interest in the United States. It is significant that the Court does not adopt the Government's elaborate argument, based on dubious and tenuous writings of publicists, see Schwarzenberger, Inductive Approach to International Law, 60 Harv. L. Rev. 539, 559, that this part of the open sea belongs, in a proprietary sense, to the United States. See *American Banana Co.* v. *United Fruit Co.,* 213 U. S. 347, 351. Instead, the Court finds trespass against the United States on the basis of what it calls the "national dominion" by the United States over this area.

To speak of "dominion" carries precisely those overtones in the law which relate to property and not to political authority. Dominion, from the Roman concept *dominium,* was concerned with property and ownership,

as against *imperium,* which related to political sovereignty. One may choose to say, for example, that the United States has "national dominion" over navigable streams. But the power to regulate commerce over these streams, and its continued exercise, do not change the *imperium* of the United States into *dominium* over the land below the waters. Of course the United States has "paramount rights" in the sea belt of California—the rights that are implied by the power to regulate interstate and foreign commerce, the power of condemnation, the treaty-making power, the war power. We have not now before us the validity of the exercise of any of these paramount rights. Rights of ownership are here asserted—and rights of ownership are something else. Ownership implies acquisition in the various ways in which land is acquired—by conquest, by discovery and claim, by cession, by prescription, by purchase, by condemnation. When and how did the United States acquire this land?

The fact that these oil deposits in the open sea may be vital to the national security, and important elements in the conduct of our foreign affairs, is no more relevant than is the existence of uranium deposits, wherever they may be, in determining questions of trespass to the land of which they form a part. This is not a situation where an exercise of national power is actively and presently interfered with. In such a case, the inherent power of a federal court of equity may be invoked to prevent or remove the obstruction. *In re Debs,* 158 U. S. 564; *Sanitary District* v. *United States,* 266 U. S. 405. Neither the bill, nor the opinion sustaining it, suggests that there is interference by California or the alleged trespassers with any authority which the Government presently seeks to exercise. It is beside the point to say that "if wars come, they must be fought by the nation." Nor is it relevant that "The very oil about which the state and nation here

contend might well become the subject of international dispute and settlement." It is common knowledge that uranium has become "the subject of international dispute" with a view to settlement. Compare *Missouri* v. *Holland,* 252 U. S. 416.

To declare that the Government has "national dominion" is merely a way of saying that *vis-à-vis* all other nations the Government is the sovereign. If that is what the Court's decree means, it needs no pronouncement by this Court to confer or declare such sovereignty. If it means more than that, it implies that the Government has some proprietary interest. That has not been remotely established except by sliding from absence of ownership by California to ownership by the United States.

Let us assume, for the present, that ownership by California cannot be proven. On a fair analysis of all the evidence bearing on ownership, then, this area is, I believe, to be deemed unclaimed land, and the determination to claim it on the part of the United States is a political decision not for this Court. The Constitution places vast authority for the conduct of foreign relations in the independent hands of the President. See *United States* v. *Curtiss-Wright Corp.,* 299 U. S. 304. It is noteworthy that the Court does not treat the President's proclamation in regard to the disputed area as an assertion of ownership. See Exec. Proc. 2667 (Sept. 28, 1945) 10 F. R. 12303. If California is found to have no title, and this area is regarded as unclaimed land, I have no doubt that the President and the Congress between them could make it part of the national domain and thereby bring it under Article IV, Section 3, of the Constitution. The disposition of the area, the rights to be created in it, the rights heretofore claimed in it through usage that might be respected though it fall short of prescription, all raise appropriate questions of policy, questions of ac-

46

commodation, for the determination of which Congress and not this Court is the appropriate agency.

Today this Court has decided that a new application even in the old field of torts should not be made by adjudication, where Congress has refrained from acting. *United States* v. *Standard Oil Co.,* 332 U. S. 301. Considerations of judicial self-restraint would seem to me far more compelling where there are obviously at stake claims that involve so many far-reaching, complicated, historic interests, the proper adjustments of which are not readily resolved by the materials and methods to which this Court is confined.

This is a summary statement of views which it would serve no purpose to elaborate. I think that the bill should be dismissed without prejudice.