**BURTON/HAWKS, INC. and Energy Reserves, Inc., Plaintiffs,**

v.

**UNITED STATES of America, the United States Department of Interior and James G. Watt, Secretary of the Interior, Defendants.**

**Civ. No. C 81–0961–J.**

United States District Court, D. Utah, C.D.

Nov. 10, 1982.

grounds as well as agency principles.

Arthur H. Nielsen, Thomas C. Jepperson, Salt Lake City, Utah, for plaintiffs.

Arthur E. Gowran, U.S. Dept. of Justice, General Litigation Section, Land and Natural Resources Division, Washington, D.C., for defendants.

## MEMORANDUM OPINION and ORDER

JENKINS, District Judge.

This matter came before the Court on September 23, 1982 for consideration of the parties' cross-motions for summary judgment. Plaintiffs, Burton/Hawks, Inc. and Energy Trading, Inc., were represented by Arthur H. Nielsen, Esq. and Thomas C. Jepperson, Esq. Arthur E. Gowran, Esq. appeared on behalf of the defendant, the United States Department of Interior. After careful consideration of the arguments made and briefs submitted, this Court enters the following Memorandum Opinion and Order.

In this case plaintiffs seek judicial review of three decisions of the Interior Board of Land Appeals (IBLA)[1] adjudging termination of plaintiff's oil and gas leases[2] on property within or near Duchesne County, Utah. The leases were issued August 1, 1969 for a ten-year term. Effective June 15, 1979 the leases were committed to the Antelope Canyon Unit Agreement[3] and plaintiff, Burton/Hawks, Inc., was designated as the unit operator. Because the leases were due to expire on July 31, 1979, the Utah Office of the Department of the Interior's Bureau of Land Management (BLM), through the United States Geological Survey (USGS), initiated an investigation into drilling operations on the leases. The USGS determined that there were no ongoing drilling operations that would war-

rant an extension of the leases under the unit agreement. Relying on the USGS evaluation, the BLM determined that the leases had expired by operation of law. On appeal, the IBLA affirmed the BLM rulings in the three cases now on review before this Court.

### I. Procedural Background

#### A. Burton/Hawks, Inc. Leases

On February 7, 1980 Burton/Hawks, Inc. appealed the BLM determination to the IBLA claiming that all of its leases were extended by production in paying quantities pursuant to section 18(e) of the unit agreement. Section 18(e) provides that the leases are valid to the end of their primary term or "so long thereafter as oil or gas are produced thereon in paying quantities." Burton/Hawks argued that it qualified for an extension of the term on all its leases because two of its wells were capable of producing paying quantities of gas or oil and because it had engaged in good faith drilling operations under the unit agreement. The two wells that Burton/Hawks claims were capable of producing paying quantities are well No. 5-1 and well No. 25-1. Each is, and at the time the lease expired, was in shut-in status, awaiting the construction of a pipeline. Plaintiff also argued that it was entitled to an extension of two years on its primary term because it had engaged in drilling operations on the unit. Those drilling activities resulted in dry holes which were plugged prior to the termination date of the leases. On April 29, 1980 the IBLA issued its decision rejecting plaintiff's arguments and finding that the requirement of a well capable of producing in paying quantities was not satisfied by the mere existence of a well without

---

1. The IBLA decisions under review are:
   a) *Burton/Hawks, Inc.*, IBLA No. 80-375, 47 IBLA 125 (April 29, 1980), as supplemented by an October 1, 1981 order;
   b) *Energy Trading, Inc.*, IBLA No. 80-472, 50 IBLA 9 (September 5, 1980);
   c) *Energy Trading, Inc.*, IBLA No. 80-376, 55 IBLA 167 (June 9, 1981).

2. The terminated leases are designated as follows:

U-8890A; U-8891-A; U-8892-A; U-8893-A; U-8901-A; U-8938-A; U-8939-A; U-8941-A; U-8942-A; U-8944-A; U-8939; U-8891; U-8892; U-8893; U-8894; U-8900; U-8901; U-8938; U-8940; U-8941; U-8942; U-8943; U-8944; and U-8998.

3. The Antelope Canyon Unit Agreement terminated automatically on August 11, 1980, in accordance with section 9 of its own terms.

actual production in paying quantities. The IBLA, however, remanded the case to afford the USGS time to consider, in its evaluation, the contentions raised by the plaintiff. In addition, the IBLA indicated that if the USGS concluded that there was not a producible well, Burton/Hawks would be given "an opportunity for a hearing on that issue where it [presents] evidence that raises an issue of fact regarding the status of wells in the unit." *Burton/Hawks, Inc.*, 47 IBLA 125, 125 (April 29, 1980). On July 15, 1980 the USGS again determined that the unit operations did not result in the requisite production capacity. Burton/Hawks submitted a request for a hearing but the IBLA denied the request claiming that plaintiff had failed to submit any evidence countervailing the USGS records.

### B. Energy Trading, Inc. Leases

#### 1. Lease U–8939

Lease U–8939 was issued August 1, 1969 for a ten-year term. Shortly before the date of expiration,[4] the lease was committed to the Antelope Canyon Unit Agreement. The USGS reported no drilling activities under the unit plan and on January 25, 1980 the BLM concluded that the lease terminated by operation of law. Energy Trading, Inc., appealed the BLM determination to the IBLA on grounds that lease U–8939 was extended by production in paying quantities prior to the expiration date. Energy Trading argued that the Burton/Hawks wells, Nos. 5–1 and 25–1, satisfied the production requirement for all the leases in the unit, despite the wells' current shut-in status. Plaintiff also claimed that its lease was entitled to a two-year extension due to drilling activities. Energy Trading relied on the drilling on lease U–8943–A, also committed to the unit agreement. That drilling began on June 29, 1979 and terminated on July 6, 1979 when the well was plugged as a dry hole. In addition, Energy Trading argued on appeal that

the BLM was estopped from terminating the lease. Plaintiff maintained that it had detrimentally relied on a USGS district engineer's representations that the drilling operations on the unit would prevent the expiration of lease U–8939. Therefore, plaintiff reasoned that the BLM and IBLA were compelled to extend the lease.

On September 5, 1980 the IBLA affirmed the decision of the BLM terminating lease U–8939 by operation of law.[5] Rejecting plaintiff's arguments, the IBLA held that production on the Burton/Hawks' wells did not qualify as production "under the unit plan" because both well No. 5–1 and well No. 25–1 were completed prior to the effective date of the unit agreement. Further, the IBLA explained that the two-year extension for expiring leases is available only when there are actual drilling operations under the unit agreement on the last day of the lease term with a bona fide intent to complete a producing well. 50 IBLA at 13. The IBLA concluded that, under this standard, lease U–8939 did not qualify for extension.

#### 2. Energy Trading, Inc.'s Other Leases

On January 8, 1980 the BLM concluded that twelve additional leases[6] belonging to Energy Trading, Inc. and committed the Antelope Canyon Unit Agreement had terminated by operation of law on July 31, 1979. As with lease U–8939, the BLM relied on the USGS determination that Energy Trading had conducted no drilling operations under the unit plan beyond the leases' expiration date. On appeal to the IBLA, plaintiff argued that the leases should have been extended under the "paying quantities" provision in the unit agreement. Because Energy Trading's arguments were essentially the same as those raised in the lease U–8939 appeal, the IBLA found its decision in that dispute dispositive. Thus, the IBLA affirmed the BLM determination

---

**4.** Lease U–8939's primary term expired on July 31, 1979 and it was committed to the Antelope Canyon Unit on June 15, 1979.

**5.** *Energy Trading, Inc.*, IBLA No. 80–472, 50 IBLA 9 (September 9, 1980).

**6.** The leases affected by the BLM decision were: U–8891, U–8892, U–8893, U–8894, U–8900, U–8901, U–8939, U–8940, U–8941, U–8942, U–8943, U–8944, and U–8998.

that the leases had each terminated by operation of law. *Energy Trading, Inc.,* 55 IBLA 167, 168 (June 9, 1981).

Plaintiffs, Burton/Hawks, Inc. and Energy Trading, Inc., filed the present action in the United States District Court for the District of Utah seeking judicial review of the IBLA decisions and reinstatement of the subject leases.

## II. Opinion

### A. Paying Quantities

█ Upon review, this Court may set aside agency decisions only if they are "arbitrary, capricious, and an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1977). See, *Ballard E. Spencer Trust, Inc. v. Morton,* 544 F.2d 1067, 1069 (10th Cir.1976). The burden of proving that the challenged decisions are arbitrary is on the plaintiff, *Angel v. Butz,* 487 F.2d 260, 263 (10th Cir.1973), *cert. denied* 417 U.S. 967, 94 S.Ct. 3170, 41 L.Ed.2d 1138 (1974), and this Court may not substitute its judgment for that of the IBLA without such showing. *E.g., American Petroleum Institute v. EPA,* 540 F.2d 1023, 1029 (10th Cir.1976); *Diamond Ring Ranch, Inc. v. Morton,* 531 F.2d 1397, 1407 (10th Cir.1976).

█ Plaintiffs claim that each of the leases subject to the IBLA decisions was improperly terminated. To support that contention plaintiffs rely on section 18(e) of the Antelope Canyon Unit Agreement. Section 18(e) provides:

Any Federal lease for a fixed term of twenty (20) years or any renewal thereof or any part of such lease which is made subject to this agreement shall continue in force beyond the term provided therein until the termination hereof. *Any other Federal lease* committed hereto shall continue in-force beyond the term so provided therein or by law as to the land committed so long as such lease remains subject hereto, *provided that production is had in paying quantities under this unit agreement prior to the expiration date of the term of such lease, or in the event actual drilling operations are commenced on unitized land, in accordance with the provisions of this agreement, prior to the end of the primary term of such lease and are being diligently prosecuted at that time,* such lease shall be extended for two years and so long thereafter as oil or gas is produced in paying quantities in accordance with the provisions of the Mineral Leasing Act Revision of 1960.

Antelope Canyon Unit Agreement § 18(e) (emphasis added). The unit agreement incorporates the relevant provisions of the Mineral Lands Leasing Act (MLLA). Section 17(j) of the MLLA states, in part, as follows:

Any lease issued for a term of twenty years, or any renewal thereof, or any portion of such lease that has become the subject of a cooperative or unit plan of development or operation of a pool, field, or like area, which plan has the approval of the Secretary of the Interior, shall continue in force until the termination of such plan. Any other lease issued under any section of this chapter which has heretofore or may hereafter be committed to any such plan that contains a general provision for allocation of oil or gas shall continue in force and effect as to the land committed so long as the lease remains subject to the plan: *Provided,* that production is had in paying quantities under the plan prior to the expiration date of the term of such lease.

30 U.S.C. § 226(j) (1976). Together these provisions permit an extension of a lease term only where production is had in paying quantities under the unit agreement prior to the expiration date of the lease. Plaintiffs argue that under the doctrine of constructive production [7] all the leases committed to the Antelope Canyon Unit Agreement were extended because production in paying quantities was had on two wells in the unit. Those wells, Nos. 5–1 and 25–1,

---

**7.** The doctrine of constructive production treats all unitized leases as one for purposes of extension by production. Pursuant to the doctrine, the extension of any unitized lease by production under the plan, will extend all other leases committed to the same unit.

are currently in shut-in status awaiting the construction of a pipeline. They were shut-in before and on the termination date of the leases. Because these wells are in shut-in status, and because each "had been drilled and completed before the effective date of the Antelope Canyon Agreement", the IBLA found that production from these wells could not be attributed to unit operations under the agreement. *Burton/Hawks, Inc.*, IBLA 80–375 (October 1, 1981). Section 18(e) of the unit agreement refers to the production in paying quantities "under this unit agreement" and the MLLA requires the production to be "under the plan". The IBLA found that production from wells drilled before the effective date of the unit agreement did not constitute production "under" the agreement. In *Energy Trading, Inc.*, 50 IBLA 9 (Sept. 5, 1980), the IBLA explained its position as follows:

> While plausible, appellant's argument is inconsistent with the terms of section 11 of the unit agreement. That section states in part:
>
> 11. PARTICIPATION AFTER DISCOVERY
>
> Determination as to whether a well completed within the Unit Area prior to the effective date of this agreement is capable of producing unitized substances in paying quantities shall be deferred until an initial Participating Area is established as the result of the completion of a well for production in paying quantities in accordance with section 9 hereof. Upon completion of a well capable of producing unitized substances in paying quantities or as soon thereafter as required by the Supervisor, the Unit Operator shall submit for approval by the Supervisor a schedule ... of all land then regarded as reasonably proved to be productive in paying quantities; all lands in said schedule on approval of the Supervisor to constitute a participating area, effective as of the date of completion of such well or the effective date of this unit agreement, whichever is later.

> The effect of this paragraph is to defer consideration of the producing status of wells completed *prior* to the effective date of the Antelope Canyon Unit (June 15, 1979), such as the Burton/Hawks No. 5–1 and No. 25–1, until a well capable of producing unitized substances in paying quantities is completed under the unit. Completion under the unit requires completion of a well on unit lands *subsequent* to the effective date of the unit, which well is capable of producing unitized substances in paying quantities. No such well was completed during the brief interval from the effective date of the unit to the July 31, 1979, expiration date of lease U–8939. Accordingly, BLM properly disregarded the Burton/Hawks No. 5–1 and No. 25–1 in holding that lease U–8939 was not extended by production elsewhere on the unit.

50 IBLA at 11–12 (emphasis original). Thus, despite the doctrine of constructive production, the IBLA concluded that the Burton/Hawks wells did not qualify the unit for extension. The IBLA determination was based on a careful reading of the unit agreement and the MLLA. Its decision appears neither arbitrary nor capricious to this Court.

### B. Two-Year Extension

■ Plaintiffs maintain that several of the leases are entitled to a two-year extension by reason of actual drilling operations on the lease. Plaintiffs base that contention on section 17(e) of the MLLA, which provides:

> Any lease issued under this section for land on which, or for which under an approved cooperative or unit plan of development or operation, actual drilling operations were commenced prior to the end of its primary term and are being diligently prosecuted at that time shall be extended for two years and so long thereafter as oil or gas is produced in paying quantities.

30 U.S.C. § 226(e) (1976). Plaintiffs argue that "actual drilling operations were commenced prior to the end of its primary term." The IBLA, however, stressed that

all of the drilling activity on which plaintiffs rely resulted in dry holes that were plugged prior to the termination date of the leases. Section 226(e) states that drilling operations must be "diligently prosecuted" at the end of the lease's primary term. Based on that language, the IBLA found that:

> To qualify for a 2-year extension pursuant to 30 U.S.C. § 226(e) (1976), the evidence must show that actual drilling operations were being diligently pursued on the leasehold or for the lease under an approved unit agreement *on the last day* of the lease term with a bona fide intent to complete a producing well.

50 IBLA at 13 (citation omitted) (emphasis in original). The IBLA ruling is in accordance with a sound interpretation of § 226(e) and is neither arbitrary nor capricious.

### C. Estoppel

▆▆ Plaintiff, Energy Trading, Inc., also claims that the IBLA is estopped from denying it a two-year extension of its lease U–8939. Energy Trading, Inc. claims that a USGS district engineer agreed that the drilling operations on the Antelope Canyon Unit would prevent the lease from terminating at the end of its primary term. Plaintiff contends that it detrimentally relied on the district engineer's assurances. Therefore, plaintiff maintains that the IBLA is estopped from acting inconsistently with those representations. The weakness of the plaintiff's position is apparent after even a cursory examination of the relevant statutory and case law.

The regulations of the Department of Interior state:

> § 1810.3 Effect of laches; authority to bind government.
>
> (a) The authority of the United States to enforce a public right or protect a public interest is not vitiated or lost by acquiescence of its officers or agents, or by their laches, neglect of duty, failure to act, or delays in the performance of their duties.
>
> (b) The United States is not bound or estopped by the acts of its officers or agents when they enter into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.
>
> (c) Reliance upon information or opinion of any officer, agent or employee or on records maintained by land offices cannot operate to vest any right not authorized by law.

43 C.F.R. § 1810.3. Section 1810.3 establishes the principle that plaintiff's reliance on the erroneous statements of the district engineer could not estop the IBLA from denying a two-year extension of the lease where the lease did not qualify for the extension under the terms of the agreement or the MLLA. The proposition that the erroneous statements of its employees do not bind the United States is well accepted in the case law. *E.g., Federal Crop Ins. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *United States v. California,* 332 U.S. 19, 39, 67 S.Ct. 1658, 1668, 91 L.Ed. 1889 (1947); *Clair R. Caldwell, et al.,* 42 IBLA 139, 141 (1979); *Paul S. Coupey,* 35 IBLA 112, 116 (1978). Thus, despite plaintiff's reliance on assurances made by the USGS district engineer, the IBLA was free to reach an independent decision on whether or not the lease expired by operation of law.

### D. Right to Hearing

▆▆ Burton/Hawks asserts that the IBLA violated its constitutional rights by denying it a hearing on the USGS determination that there was no drilling activity on the unit extending beyond the termination date. In denying Burton/Hawks' request for a hearing the IBLA stated, "(t)here is nothing in the record before us to show that Burton/Hawks submitted any evidence to countervail the records of [USGS] nor any which has not made an offer of proof which might persuade a different conclusion from that expressed by the Board in *Energy Trading, supra.* We find that a hearing is unnecessary in this case." *Burton/Hawks, Inc.,* IBLA 80–375 (Supplemental Order) (Oct. 1, 1981). The USGS made the determination for the BLM and IBLA concerning the drilling activities on the unit. The

BLM and IBLA are entitled to rely on USGS determinations in the absence of a clear and convincing demonstration of error. *Corrine Grace,* 30 IBLA 296, 300 (1977). Without some showing of error in the USGS evaluation, the IBLA may rely on it in its decision-making process. In the present dispute, plaintiff proffered no evidence on the validity of the USGS determination. Rather, Burton/Hawks challenged the application of the relevant contract and statutory provisions to the uncontested records of the USGS. Under those circumstances, a hearing on the matter was, as the IBLA found, unnecessary.

Based on the foregoing, it is hereby ORDERED that defendant United States Department of Interior's motion for summary judgment is GRANTED. Burton/Hawks, Inc. and Energy Trading, Inc.'s motion for summary judgment is DENIED and the IBLA decisions challenged in this action are AFFIRMED.