JESÚS T. PIÑERO, GOVERNOR OF PUERTO RICO, Complainant and Appellant, *v.* ANDRÉS GRILLASCA, MAYOR OF PONCE, Respondent and Appellee.

No. 17. Argued November 17, 1947.—Decided December 19, 1947.

*Luis Negrón Fernández, Attorney General, Angel Umpierre* and *Guillermo Gil, Assistant Attorneys General,* and *José C. Aponte, General Prosecuting Attorney,* for appellant. *Francisco M. Susoni, Jr.,* and *Cayetano Coll Cuchí* for appellee.

Mr. Justice Snyder delivered the opinion of the Court.

Section 29 of the Municipal Law [1] provides that the Mayor of a municipality may be removed for just cause by the Municipal Assembly on charges made by the Governor. The Governor filed seventeen charges against Andrés Grillasca, Mayor of Ponce. After a trial on the merits, the Municipal Assembly unanimously dismissed all the charges, and the Governor appealed.

## I

The first charge is that Grillasca had a direct and indirect interest in contracts entered into between the Municipality and the firm of García & Cintrón for crushed stone and gravel, in violation of § 10 of the Municipal Law and §§ 202 and 203 of the Political Code. [2]

The alleged interest of Grillasca in these contracts is predicated on his signature, with Luciano Martiniano García and Juana Clavell, in 1943 of a note in favor of the Banco de Ponce for a loan of $17,500. The proceeds of this loan were used by García & Cintrón to purchase the properties of Atlantic Ore Co. which operated the quarry from which the stone and gravel covered by the contracts were obtained.

The note was signed by Grillasca and the others as debtors *in solido*. However, the Municipal Assembly found as a fact that Grillasca had signed as a surety for García. This finding is amply supported by the testimony and the books of the bank. We cannot, as the appellant urges us, discard this finding in the face of the uncontroverted testimony that Grillasca, although in form a debtor *in solido,* was in fact a surety for García. Indeed, this finding becomes irresistible in view of the undisputed fact that García & Cintrón received

[1] Act No. 53, Laws of Puerto Rico. 1928 (p. 334), as amended by § 1 of Act No. 288, Laws of Puerto Rico, 1946 (p. 674).

[2] Section 10, as found in Act No. 253, Laws of Puerto Rico, 1946, makes it a misdemeanor for a Mayor to "be interested directly or indirectly in contracts entered into with the municipality . . .". Section 10 has so provided since its original enactment. Section 202 of the Political Code has a similar prohibition.

the money and payments on the loan were thereafter made by García & Cintrón.

The Municipal Assembly also found that at the time Grillasca signed the note he did not know the loan was being made in order that García & Cintrón could use the proceeds to purchase the properties of Atlantic Ore Co. The Municipal Assembly also found that Grillasca did not know the proceeds were so used until after the firm of García & Cintrón was constituted. However, Grillasca of course knew between 1943 and 1947, when these contracts were being awarded to García & Cintrón, that the proceeds of the loan for which he was a surety were used to establish the firm of García & Cintrón.

In view of these facts, the question to be determined here is not whether § 10 of the Municipal Law bars the Mayor from being a surety in connection with a specific contract between a vendor and the Municipality. That question would arise if, for example, the Mayor were a surety for the vendor on a performance bond. Here the question is rather whether the Mayor has a direct or indirect interest within the meaning of § 10 in a contract between the Municipality and a firm under the following conditions: (1) the Mayor was a surety on a general loan to one of the partners of the firm; (2) the general loan was made prior to the contracts between the Municipality and the firm; (3) the general loan was in no way related to the specific contracts between the Municipality and the firm.

This question has never been decided in this jurisdiction. The cases cited by the appellant are not in point. In those cases it was clearly established that the Mayor had a direct pecuniary interest in the specific contracts. *People ex rel. Pérez v. Manescau*, 33 P.R.R. 703; *Díaz v. Charneco*, 48 P. R.R. 521; *Municipal Assembly v. González, Mayor*, 55 P.R.R. 526, 541–43.

The appellant also relies on four cases from other jurisdictions; *i.e., Lessieur v. Inhabitants of Rumford*, 93 A. 838

(Me. 1915); *James v. City of Hamburg,* 156 N. W. 394 (Ia. 1916); *Lincoln v. First Nat. Bank,* 19 N.W. (2d) 156 (Neb. 1945); and *Matter of Clamp,* 33 N.Y.S. 250 (1900). These cases likewise do not furnish the answer to our problem. In the first place, the question in those cases was whether the contracts were valid, not whether the public officers involved should be impeached. Secondly, they involved situations where the official had a direct and specific connection with the contract as such, and not as here where the Mayor was a surety for the vendor on a general loan without reference to the contracts between the vendor and the Municipality. Finally, *Matter of Clamp* was decided under a New York statute which provides that a public officer shall not be directly or indirectly interested in any contract with the government "either as principal, surety or otherwise . . .". Section 10 does not specifically prohibit the Mayor from being a surety for such a contract.

Assuming, without deciding, that we would hold, despite the absence of the specific language found in the New York statute, that § 10 inhibits a Mayor from being a surety for the vendor in a contract between the latter and the Municipality, that still does not answer the question of whether the Mayor nevertheless may as here be a surety for the vendor on a general loan that is in no way related to the contracts between the vendor and the Municipality.

The parties have cited no cases on this point. The closest cases we have found are those passing on whether statutes like § 10 apply to a case where the public official is a general creditor of the vendor rather than his surety. The cases are divided on whether contracts between the vendor and the municipality are prohibited under such circumstances. Annotation, 73 A.L.R. 1352.

We are aware of factors on both sides of this question. As a matter of public policy, the Mayor might be tempted to favor a vendor who owed him money on some other independent private transaction. Yet some of the cases hold

that this danger is remote, and that the statute applies only when the interest of the Mayor is real and pecuniary.

We need not decide at this time which rule we would follow. The contracts are not being challenged here as void. Indeed, if they were being so challenged, Grillasca could point out that, even if we held that the Mayor may not award contracts to a vendor if the former is a general creditor of the latter, here the Mayor was one step removed: he was a general surety, not a general creditor of García & Cintrón. In addition, his dealings were with an individual partner, not with the vendor firm. In any event, it may be that as a close question of law it might perhaps be ultimately concluded, if the issue ever arose, that the contracts between García & Cintrón and the Municipality were void merely because the Mayor was a surety on a loan to García which had no relation to the contracts between the Municipality and García & Cintrón. But in the absence of willful wrongdoing by the Mayor, which the Municipal Assembly found wholly lacking here, we cannot hold that the Mayor must be impeached because we may some day hold that he decided incorrectly a close question of law, on which other courts are divided and on which we have not yet passed. See footnote 6.

## II

■■ The second charge is that by virtue of the aforesaid contracts the Mayor created a monopoly in favor of the firm of García & Cintrón, which consists of García, the brother-in-law of the Mayor, and Cintrón, the minor son of Juana Clavell, Treasurer and Director of Schools of Ponce. Before discussing this charge, we pass to the next group of charges.

Charges three to ten are that on different dates, without calling for bids as required by § 8 of the Municipal Law, the Mayor purchased from García & Cintrón on behalf of the Municipality crushed stone and gravel, exceeding $2,000

in value, to be used in the project for paving the streets of Ponce and other municipal projects. Some of the charges recited that several orders were issued on the same day for the same materials for amounts less than $2,000, but aggregating more than $2,000, with intent to evade the requirements of § 8.[3]

The Mayor undoubtedly approved payments for crushed stone and gravel which were purchased from García & Cintrón at prices exceeding $2,000 without calling for bids and which were for use in the project for construction and paving of the streets of Ponce.[4] In order to determine if this action of the Mayor was in violation of § 8, we turn first to the question of whether this project was a "public work" of the Municipality within the meaning of § 8.

The project for paving the streets of Ponce was originally a Federal WPA project. It became a project of the War Emergency Program of the insular government, known as PEG, when WPA went out of existence. See Act No. 16, Laws of Puerto Rico, 1942, Third Special Session (p. 50). The question of whether as a matter of law the project was insular or municipal is difficult to answer. Perhaps it is best classified as a hybrid project. It certainly was not exclusively municipal. Cf. Loans from the PWA in Excess of City Debt Limits, 47 Harv. L. Rev. 688; Foley, Municipal Financing of Public Works, 4 Fordh. L. Rev. 13, 15–17, 24–25. Under both WPA and PEG,[5] the Municipality "sponsored" the project. This meant in effect that the Municipality

---

[3] Section 8 of the Municipal Law provides that "All public works shall be done and all materials and supplies shall be purchased on call for bids when the value or cost thereof exceeds two thousand (2,000) dollars in first-class municipalities . . .".

[4] Certain of the charges recite that some of the stone and gravel was for other projects as well as for paving the streets of Ponce. However, the appellant does not argue that materials were purchased for more than $2,000 without calling for public bids for any exclusively municipal project.

[5] The parties seem to agree that the procedure under which the Municipality sponsored projects of WPA and PEG was, for our purposes, substantially the same. We therefore confine our discussion to the procedure under PEG.

would benefit by the project. However, in this case and almost invariably the contribution of PEG toward the cost of the project was considerably larger than the contribution of the Municipality. But the most significant feature of the agreement between PEG and the Municipality was that control and administration of the project, from its inception to its completion, was vested in PEG. Even when the contribution of the Municipality was cash, it was not spent by the Municipality directly on the project. Instead the cash was turned over to PEG and disbursed by PEG. And no one contends that PEG was required to expend such cash pursuant to § 8 of the Municipal Law, or that the Mayor was obliged by law to see that PEG complied with § 8 in making such expenditures. Indeed, § 3(i) of Act No. 16 of 1942 specifically empowered PEG to waive calling for public bids for its projects.

The problem is somewhat more difficult where as here the contribution of the Municipality to a PEG project is materials, and not cash. When § 8 was originally enacted, the concept of a PEG-municipal project was unknown. It could therefore be argued that when it passed § 8 the Legislature had in mind only projects which were planned, administered and controlled by the Municipality exclusively, and consequently that § 8 does not apply here. Yet there is considerable force to the contrary argument that the language of the Legislature is absolute, and that any purchase of materials by the Municipality where the cost exceeds $2,000 must be made by calling for bids. The latter contention would perhaps prevail if the Municipality was simply purchasing materials. But that was not the situation here. In this case the materials were purchased in order to be turned over to PEG for use by it in a project which PEG administered and controlled. The crucial question therefore is the manner in which the identity of the vendor of the materials and the amount thereof were determined.

When we turn to the testimony on this last question, we find that Rafael V. Urrutia, Chief of the Division of Operations of PEG, testified that when the sponsoring municipality agreed to furnish any materials for a PEG project, PEG dictated only the quantity and quality of the materials, and that the vendor was selected by the Municipality without any intervention by PEG. However, he admitted that he had no actual knowledge of how materials were in fact acquired for the Ponce paving project. His testimony therefore was only as to the rules of PEG in general, and not how they had actually functioned in practice in this case.

On the other hand, Salomón Jorge Elías, who was the PEG Superintendent at Ponce for this project, testified that he and the Mayor had come to an understanding that Elías was to select the vendors of the materials because he was familiar with such matters and the Mayor was not. He testified that after investigation he concluded that the Atlantic Ore Co. was the only supplier which could furnish the crushed stone and gravel for this project; that he therefore personally selected that company as the vendor of the crushed stone and gravel for this project; that García & Cintrón, as the successor of the Atlantic Ore Co., continued to supply these materials, which could not be acquired from any other vendor; that he would personally order the materials directly from the supplier whenever they were needed; that after he certified that the same had been received, the vouchers would be sent to the Municipality for payment; and that the Mayor had never participated in any way in the choice of the supplier or in deciding how much should be bought at any particular time. This testimony was corroborated by Edil M. Rivera, Director of Public Works of Ponce.

The appellant contends that the finding of the Assembly that the only function performed by the Municipality was to contribute the cost of the purchase of the materials is not sustained by the testimony, and that on the contrary the vouchers and other documentary evidence demonstrate that

the Municipality selected the vendor. If we relied solely on the documentary evidence and on the regulations of PEG, as described by Urrutia, the contention of the appellant would undoubtedly be correct. But the Municipal Assembly found as a fact that the project had not been administered as the regulations provided. Rather it found—and the testimony supports this finding—that the PEG Superintendent selected the vendor and determined when and how much materials should be purchased.

Perhaps the Mayor had the legal authority to insist that the Municipality was in control of the purchase of materials for the project. He could have perhaps also gone further and, to protect himself, insisted that the materials be purchased by calling for bids pursuant to § 8. But the testimony of Elías shows that the Mayor was realistic. He was aware that senior partners seldom take dictation from junior partners. The record contains examples of the hazards to which sponsored projects were subjected before they were completed by PEG. Funds or workmen allocated by PEG to such projects were suddenly withdrawn or reduced. Moreover, these projects were administered under war conditions; materials and gasoline for operation of machinery and transportation were difficult to obtain. The Mayor apparently concluded that the best way to insure completion of the project at the least cost was to give PEG *carte blanche:* the Municipality would pay for the materials; PEG would determine the method of purchase, the identity of the vendor and the amount of material needed at a particular time.

To protect himself, the Mayor should have put in writing his understanding with the PEG Superintendent that the latter was to select the vendor and amount of materials. Also, he would have been better advised if he had assumed that § 8 of the Municipal Law might possibly apply and, out of an abundance of caution, he had obtained an ordinance of the Municipal Assembly reciting an emergency as to the spe-

cific materials to be purchased from García & Cintrón without calling for bids, as provided by § 8. Cf. *Ortiz* v. *Palmer*, 61 P.R.R. 655. But the Mayor acted energetically in times of war and emergency to obtain great benefits for the Municipality without cost to it. And the testimony shows beyond peradventure that the Mayor gained nothing personally from these transactions, and that as a result of this method of purchase, the Ponce PEG project was completed at considerably less cost than similar PEG projects elsewhere.

The Mayor took the risk that some of his actions might subsequently be declared technically illegal. He took these risks for the sake of Ponce. Now, with the omniscience of hindsight, after a seven-year administration, a fine tooth comb investigation discloses these purchases of materials. The Municipal Assembly has tried the Mayor pursuant to law. It has held that the Mayor does not deserve the stigma of impeachment. We are not prepared to say that the facts permit only the contrary conclusion when the facts are that on the close question of law of whether § 8 of the Municipal Law applied to a PEG-municipal project, the Mayor, in order to insure completion of the project at the lowest possible cost, decided in effect that § 8 did not apply and permitted the PEG Superintendent to select the supplier of materials instead of calling for bids therefor. In this connection, it must be remembered that if the contribution of the Municipality had been cash instead of materials, as we have seen, PEG would have bought the materials without reference to § 8.

There undoubtedly are cases where the law so clearly applies that a mayor must be removed if he deliberately and persistently defies the law and refuses to follow it. But where as here there is a close question of law, and where the decision of the Mayor resulted in benefit for the Municipality and involved no personal benefit or corruption on his part, we fail to see how we would be justified in reversing

the judgment of the Municipal Assembly dismissing such a charge.[6]

We emphasize that the question of whether the contracts for these materials were valid in view of § 8 is not before us. We hold only that under all the circumstances the action of the Mayor does not require impeachment.

In view of our discussion of charges three to ten, the second charge that the Mayor created a monopoly in favor of García & Cintrón is without basis. The facts in *Municipal Assembly* v. *González, Mayor, supra*, p. 543, on which the appellant relies, were obviously different from this case.

### III

 Charges 11, 12 and 13 are that Fernando Sánchez, Director and Chemist of the Ponce Aqueduct, Edil M. Rivera, Director of Public Works, and Herminio Echevarría, ex-Municipal Secretary and School Principal of Ponce, received payments in addition to their salaries, in violation of paragraph 13 of § 34 of the Organic Act, 48 U.S.C.A. § 838, and of § 177 of the Political Code prohibiting double compensation.

In the case of Sánchez the testimony was that he was paid $150 a month as Director and chemist of the Ponce aqueduct; that the aqueduct and auxiliary facilities thereof were outside the city; that Sánchez was required to inspect these facilities; that when they were not properly inspected, the water became contaminated; that an automobile was indispensable for him to perform his inspection duties properly;

---

[6] We note in passing that our discussion of charges three to ten also applies to the first charge and furnishes an additional reason for dismissal of the first charge. We have concluded that § 8 of the Municipal Law does not so clearly apply to the contracts between García & Cintrón and the Municipality for materials for PEG projects as to warrant impeachment of the Mayor for failure to comply therewith. By the same token, even if we assumed that the signature by the Mayor of the note as surety for García gave him the direct or indirect interest contemplated by § 10 of the Municipal Law, these contracts are not so clearly municipal contracts, particularly in view of the circumstances under which they were executed, as to justify impeachment of the Mayor because of his participation in their execution.

that the military authorities were disturbed by the fact that the drinking water in Ponce was not up to standard; that no automobile could be obtained by the Municipality for his use during this period due to the war; that the Mayor, after consulting various members of the Municipal Assembly, agreed with Sánchez that the latter would use his own automobile for his official duties, for which he would receive a flat sum of $75 a month for gasoline, repairs, depreciation and chauffeur; and that after this arrangement was made, and as a result of his inspections and other efforts, the water became standard and the military authorities were satisfied.

The appellant relies on *López* v. *Martorell*, 59 F.(2d) 176 (C.C.A. 1st, 1932); *Báiz* v. *Racing Commission*, 63 P.R.R. 463; and *People ex rel. Castro* v. *Padrón*, 60 P.R.R. 777. None of these cases is in point. They involve double compensation for services as such. Here the problem is whether reimbursement for gasoline and use of the employee's automobile constitutes a violation of paragraph 13 and § 177. That question was not considered in those cases.

The strict provisions of law prohibiting double compensation cannot be evaded by subterfuge. But the circumstances here show the dire necessity for an official automobile for Sánchez, the inability of the Municipality to obtain one due to the war, and the actual use of his own car, including expenditures for gasoline, for this purpose. It would undoubtedly have been more desirable if the Municipality had reimbursed Sánchez for his exact expenses instead of paying him a flat sum every month. But it is familiar practice in the Federal government, for example, to reimburse employees using their own automobiles on official business at a fixed sum per mile instead of requiring them to keep detailed and burdensome accounts of actual expenditures. If Sánchez used his car constantly on official business, certainly $75 a month cannot be said to be wholly unreasonable as an estimate of his expenditures.

We do not stop to determine if this method of reimbursing him was in accordance with the practice required by the Auditor. Assuming it was not, that sole irregularity would scarcely justify impeachment.

Except for insignificant differences in detail, the facts involved in the payments to Rivera are similar to the Sánchez case. We therefore need make no additional comment thereon.

As to Echevarría, he had been Secretary of the Municipality. He left this post to work for the insular Department of Education. There was no one trained to do some of his previous work. He therefore worked after hours for the Municipality during May and June of 1945, for which he received two payments of $60 each.

The Municipal Assembly found that the value of his services were in excess of the amount paid to him. It also found that the Department of Education "had recognized the right of employees of the category of Mr. Echevarría to do that type of work and to collect for it in hours outside of those of his employment by the insular Government".

The appellant in his brief makes no comment on this last finding of the Municipal Assembly. If we accept it as true, the Mayor was guilty of no wrongdoing, irrespective of the legality of such dual work and compensation. And even assuming that the Department of Education had not authorized the practice and that it was illegal for the employee to collect therefor, cf. *López* v. *Martorell, supra,* we scarcely think the Mayor should be impeached solely because he pressed into temporary and urgent service a former employee and gave him modest compensation therefor.

## IV

The fourteenth charge is that the Mayor approved for payment for services the bill of a certified public accountant for $325, which was improperly charged to the item -"Services of a Secretary and Legal Advisor of the Mayor".

The Assembly found that the charge for the services was reasonable; that the Mayor had no part in charging the bill to any particular item, which was done subsequently by the Municipal Auditor; that in any event, this was a clerical error which could thereafter be corrected in the books of the Municipality; and that such corrections were commonly made in the books of all the municipalities, the insular departments and the Auditor of Puerto Rico.

The appellant made no showing that there was no item to take care of this bill or that the Mayor had hired the accountant deliberately intending to pay him out of an improper item. The only proof was that the bill actually was paid out of a wrong item. And, according to the appellant, it is now too late to correct the error, as the year in question has terminated.

Assuming the bill was charged to the wrong item, the error was not made by the Mayor. Moreover, correction of such an error is one of the minor duties of the Municipal Auditor, not of the Mayor. To assert that a charge of this nature warrants impeachment of the Mayor of Ponce is to trivialize the procedure contemplated by § 29 of the Municipal Law. No major official of any government could stay in office twenty-four hours if he could be impeached for any minor clerical error committed by one of his subordinates.

## V

█ Section 1 of Joint Resolution No. 57, Laws of Puerto Rico, 1925 (p. 1134), authorized the Municipality of Ponce to construct a bulkhead in the Ponce harbor in cooperation with the Federal Government. Under § 2 the Governor was "authorized to transfer to the Municipality of Ponce the title of ownership to all the lands reclaimed from the sea through the dredging of the said harbor".

The fifteenth charge is that the Mayor knew that 35.506 *cuerdas* of a certain tract of land had not been reclaimed from the sea pursuant to Joint Resolution 57 but belonged to

the Water Resources Authority; that nevertheless, in March, 1946, by submitting false information, the Mayor obtained a certificate from the Commissioner of the Interior that 40.411 cuerdas of land had been drained and reclaimed from the sea; that this was done in order to obtain inscription thereof in the name of The People of Puerto Rico and thereafter to obtain from the Governor a conveyance of said land to the Municipality of Ponce, under Joint Resolution No. 57; that the Mayor obtained inscription of this tract in the name of The People of Puerto Rico; and that on March 25, 1946, the Mayor succeeded in obtaining a deed executed by the Governor transferring the said tract to the Municipality.

The testimony shows that in 1945 the Mayor began his efforts to establish the interest of the Municipality in this tract of land. He hired a reputable firm, Frank Rullán Associates, to measure the land in order to determine its boundaries. The firm turned this task over to one of its employees, Frank Gatell. The latter inspected a War Department plan; he discussed the matter with Angel Sacarello, Chief of the Bureau of Docks and Ports in the Department of the Interior; he saw a plan in the Public Lands Division of the Department of the Interior; and he made a field trip to examine the tract itself. He then made a plan of the land in question.

The Mayor utilized the plan turned over to him by Frank Rullán Associates in obtaining from the Department of the Interior a certificate that the tract had been reclaimed from the sea pursuant to Joint Resolution No. 57. That certificate is the key to this charge. On the basis of the certificate and at the request of the Mayor, the property was first recorded in the name of The People of Puerto Rico and then, after approval of the Attorney General as to form, conveyed by the Governor to the Municipality of Ponce. The case against the Mayor therefore stands or falls on whether he deliberately deceived the Department of the Interior in obtaining the certificate.

The only evidence offered by the appellant, in support of its charge of fraud on the part of the Mayor, was the testimony of Sacarello. He testified in substance that he ordered the issuance of the certificate requested by the Mayor solely because Grillasca assured him that the tract had actually been reclaimed from the sea by virtue of the work done pursuant to Joint Resolution No. 57. But the Municipal Assembly refused to believe this testimony of Sacarello. Since the Municipal Assembly saw and heard the witness, it was the best judge of his credibility. We see no basis on which we could hold that the Municipal Assembly was compelled to believe Sacarello. See *Tugwell, Governor,* v. *Campos,* 65 P.R.R. 620.

On the contrary, even if we were acting without the benefit of the finding of the Municipal Assembly, it would be difficult for us to believe that a high official of the insular government would take such important action on the mere *ipse dixit* of a person representing an entity with a conflicting interest without making an independent investigation to protect the interests of the insular government. Indeed, Sacarello admitted it would have been better if he had made an inspection of the tract. And Armando Morales, Engineer Director of the Public Lands Division of the Department of the Interior, which prepared the certificate, contradicted the testimony of Sacarello that the latter had relied solely on Grillasca's assurances. Morales testified that when Sacarello had come to him with Grillasca and his attorney with a request to prepare the certificate, Morales inquired if "this has been certified by the Ponce Inspector". Sacarello replied, "No, sir; it has been by my office . . .". Morales also testified as follows: " . . . When Mr. Sacarello gave you the information, did he tell you he had obtained it from the Mayor or from the Chiefs of his Department?" "From the chiefs, and from a plan of Mr. Rullán."

But even if we assume that Sacarello's testimony was true, that does not necessarily show that the Mayor knew

he was pressing a false claim. At the most it shows that Sacarello was negligent in not protecting the interests of the insular government when he ordered the issuance of the certificate without investigating the merits of the Mayor's claim. The Mayor undoubtedly urged Sacarello to issue the certificate. But so far as the record shows, the claim of the Mayor was made in good faith, although it may or may not have been a mistaken claim as a matter of fact and law.

The record shows that a *bona fide* controversy now exists as to whether this tract is covered by Joint Resolution No. 57. Gatell testified he found that at high tide it was partly submerged and partly swamp; but he was unable to say if prior thereto it had ever been reclaimed from the sea. And whether all or some of the tract was actually reclaimed from the sea years ago under Joint Resolution No. 57 is now the dispute.

The Municipal Assembly did not undertake to decide this controversy. Nor do we in this proceeding. That must be determined in a plenary suit. But the record before us shows no fraud on the part of the Mayor in making the claim of the Municipality. It is true that he made strenuous efforts to establish a claim which his predecessors had neglected for a number of years. But his zeal in that respect is to be commended rather than condemned.

For many years State officials not only asserted that submerged lands along their coastal areas belonged to their States instead of to the Federal Government but also exercised acts of ownership over these lands. The Supreme Court recently held that the United States has always possessed full dominion and power over these lands. *United States* v. *California,* 332 U.S. 19. But no one has suggested that Governors who on behalf of their States took this mistaken position should be impeached.

If the claim of the Municipality to this tract has no merit, the courts will so decide. But the Mayor, absent proof of

fraud which is wholly lacking here, should not be required to stake his right to his ofﬂce on the validity of this claim.

## VI

 The sixteenth charge is that from 1942 to 1946 the Mayor, without the consent of the Municipal Assembly as required by § 29 of the Municipal Law, paid $150 a month for legal services to Francisco M. Susoni, who was not the attorney for the Municipality.

The testimony showed that the Mayor made a verbal contract with Susoni to serve as attorney for the Municipality for $150 a month; that he performed valuable services, for which he received the amount stipulated; that in 1945 the verbal contract was reduced to writing; and that the Municipal Assembly did not participate in employing Susoni as attorney for the Municipal Assembly.

Section 29 does not provide that the Mayor may not appoint the attorney for the Municipality without the consent of the Municipal Assembly. Rather it provides that "In no proceeding . . . where the municipality . . . is a party, shall the mayor . . . pay for the services of a lawyer *other than the city attorney,* without the consent of the municipal assembly". (Italics ours.) See *Valldejuli* v. *Municipality,* 43 P.R.R. 39. Here the Mayor employed Susoni as the regular attorney for the Municipality, without the consent of the Assembly. This is not prohibited by §29.

The fact that a position entitled "Attorney for the Municipality" did not exist during this period does not affect this question. There were items in the different budgets to pay for the services of a legal advisor. That was sufficient authority for the Mayor to employ and pay Susoni as attorney for the Municipality. And even if it were not, we would be making a mockery of the provision of § 29 that a Mayor shall be impeached only for just cause, if we held that the Mayor must be impeached because he was mistaken in believing that he could hire someone to serve as the at-

torney for the Municipality by virtue of a provision in the budget for a legal advisor. See *State* v. *Naumann*, 239 N.W. 93, 95 (Ia. 1931); *State* v. *Meek*, 127 N.W. 1023, 1027 (Ia. 1910).

## VII

 The seventeenth charge is that in 1946 the Mayor authorized the payment of $10,000 to Francisco M. Susoni for special legal services in connection with the conveyance to the Municipality of the tract of land involved in the fifteenth charge, knowing that the Municipality did not acquire title to the land because it was not reclaimed from the sea as required by Joint Resolution No. 57.

What we have already said with reference to the fifteenth charge is sufficient to dispose of this charge. We need only add that when Susoni wrote a letter to the Mayor requesting compensation for these special services, the Mayor referred the letter to the Municipal Assembly. The latter, without any participation by the Mayor, by a formal resolution, fixed the fee in question. We fail to see how compliance by the Mayor with that mandate of the Municipal Assembly calls for his impeachment by the Municipal Assembly.

The decision of the Municipal Assembly dismissing the charges will be affirmed.