**STATE OF OREGON et al.**

v.

**FEDERAL POWER COMMIS-
SION et al.**

**No. 13345.**

United States Court of Appeals
Ninth Circuit.

Feb. 18, 1954.

Rehearing Denied April 28, 1954.

Healy, Circuit Judge, dissented.

348

Robert Y. Thornton, Atty. Gen., State of Ore., E. G. Foxley, Deputy Atty. Gen., Arthur G. Higgs, Asst. Atty. Gen., for appellant.

Willard W. Gatchell, General Counsel, Howard E. Wahrenbrock, Asst. Gen. Counsel, John C. Mason, Attorney, Federal Power Commission, Washington, D. C., for appellee.

Phillips, Coughlin, Buell & Phillips, Clarence D. Phillips, Portland, Ore., for intervenor.

Rollin E. Bowles, Carl D. Etling, Portland, Ore., amici curiæ.

Before STEPHENS, HEALY and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

The Portland General Electric Company, an Oregon non-governmental public utility corporation, applied for and has been granted a license [1] by the Fed-

---

I. The original application was filed by the Northwest Power Supply Co. of Portland, Oregon, on May 23, 1949, for a license under § 4(e) of the Federal Power

eral Power Commission to construct, operate and maintain a hydro-electric plant known as the Pelton Project, numbered 2030, on the Deschutes River [2] in Oregon. The Project is to be located downstream from where Crooked River and Metolius River, two principal tributaries to the Deschutes, flow into the latter. The Project is designed to consist of a concrete dam approximately two hundred five feet high in connection with a powerhouse containing three 36,000 kilowatt generators and is to be built across the river on United States land. Included in the Project, and three miles below the power dam, a "re-regulating" dam is to be constructed which is designed to equate the flow of water as it is released from the upper dam. It is not claimed that the lower dam will be located upon federal land or federally controlled land. Without it the flow below the power dam would be subject to extremes as the water would be released from the power dam in much greater quantity when peak loads of electric energy were required. There will be no diversion of water from the stream, as it will flow, undiminished, through or over the dams and continue down the natural bed. The impounding of water above the upper dam will create a relatively narrow lake in mountainous terrain of five or six miles in length.

We quote from respondent Federal Power Commission's brief (at pages 1 and 2):

"The project, if constructed, would occupy lands of the United States set aside on the west side of the Deschutes River by treaty in 1855 as the Warm Springs Indian Reservation, and additional lands of the United States on the east side of the river. All of the lands of the United States on both sides of the river which would be occupied by the project have been withdrawn from entry, location or other disposal under the public land laws and reserved for power purposes. In addition to these lands, some private lands would be affected by the project.

"The high power dam, and the powerhouse immediately below, will be located entirely upon lands of the United States set aside and reserved for power purposes. * * *."

The State of Oregon, The Fish Commission of Oregon, and The Oregon State Game Commission appeared before the Federal Power Commission hearing and registered objections to the granting of the license on the grounds that the dams would prevent the ascent of anadromous fish to their spawning grounds above the dam sites, and would result in the serious curtailment of the fish population and prevent its increase, and would impair the productivity and usefulness of the extensive State Fish Hatchery on the Metolius River. They further contended that the Commission was without authority to grant the license applied for since the applicant had failed to obtain a permit from the Hydro-Electric Commission of Oregon [3] and had not complied with the Oregon law as to fish in the

---

Act, Title 16 U.S.C.A. § 797(e). On June 15, 1951, a supplemental application was filed by the Northwest Power Supply Co. and the Portland General Electric Co., requesting that the license be granted to the latter.

2. The Deschutes River drains the eastern slopes of the Cascade Range and flows northward, emptying into the Columbia River about fifteen miles upstream from The Dalles, Oregon.

3. Vol. 8 Oregon Compiled Laws Ann. § 119–103: "From and after the taking effect of this act, no water-power project involving the use of the waters of any of the lakes, rivers, streams or other bodies of water within the state of Oregon, including waters over which this state has concurrent jurisdiction, for the generation of electricity, shall be begun or constructed except in conformity with the provisions hereof."

But compare Vol. 8 Oregon Compiled Laws Ann. § 119–101.

river,[4] as required by § 9(b) of the Federal Power Act.[5]

Having been unsuccessful in their contentions before the Commission, as aggrieved persons, the objectors have petitioned this court for review of the order issued [6] and upon such review to set aside the order granting the license.

The Izaak Walton League of America (Oregon Division) filed a brief with us as *amicus curiae* in support of the objectors' plea that the license granted should be set aside.

There is conflict in the evidence as to the probable effect of the proposed Project upon the fish population of the streams affected as well as to the need for the power which the Project is designed to produce. However, there is substantial evidence in support of the Commission's findings as to the need for power, but in our opinion the evidence practically demonstrates that the Project would seriously affect the normal population of the fish in the river and the usefulness of the State Fish Hatchery. Whether the jurisdiction of the Federal Power Commission was broad enough to authorize such findings as binding against the State of Oregon, if supported by the evidence, will presently be considered.

■ The Commission, in its consideration of the application for the license, based its jurisdiction to entertain and grant the application solely upon the fact that the principal or upper dam is to be built upon and affects land reservations [7] of the United States,[8] inclusive of the lands of the Warm Springs Indian Res-

4. Vol. 5 Oregon Compiled Laws Ann. § 83–314: "(a) It shall be unlawful for any person to construct any dam or artificial obstruction across any stream in this state frequented by salmon or other food fish, or to maintain any such dam or obstruction heretofore erected without providing a passageway for such fish over such obstructions, such passageway for fish to be constructed as near the main channel as may be practicable. * * * "

Section 12 of the Act of Congress, August 14, 1848, 9 Stat. 323, 328, establishing the territorial government of Oregon, provided as follows: "*And be it further enacted*, That the rivers and streams of water in said Territory of Oregon in which salmon are found, or to which they resort, shall not be obstructed by dams or otherwise, unless such dams or obstructions are so constructed as to allow salmon to pass freely up and down such rivers and streams."

Oregon Constitution of 1859, § 7, Art. XVIII: "All laws in force in the territory of Oregon when this constitution takes effect, and consistent therewith, shall continue in force until altered or repealed." Vol. 9 Oregon Compiled Laws Ann. p. 311.

5. § 9(b) of the Federal Power Act, 41 Stat. 1068, Title 16 U.S.C.A. § 802(b): "That each applicant for a license hereunder shall submit to the commission—
   "(a) * * *
   "(b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this Act."

6. § 313 of the Federal Power Act, 49 Stat. 860, Title 16 U.S.C.A. § 825*l* (b). Under this section an aggrieved person may petition for a review in the United States Court of Appeals, which court may "affirm, modify, or set aside such order in whole or in part."

7. The site of the upper dam cannot be designated "public lands" of the United States, since under § 3(1) of the Act, 16 U.S.C.A. § 796(1), such lands are defined as being "subject to private appropriation and disposal under public land laws." The upper dam is to be constructed upon reservations as defined in § 3(2) of the Act, i. e., lands "reserved, or withheld from private appropriation and disposal under the public land laws * * * " but excluding national monuments or national parks.

8. Title 16 U.S.C.A. § 797(e), § 4(e) of the Federal Power Act. See, also, § 23(b) of the Federal Power Act, Title 16 U.S.C.A. § 817, which makes it unlawful to build a dam or powerhouse upon federal land except under the terms of a license issued by the Federal Power Commission.

ervation.[9] The Indians of the Reservation have given their consent to the construction of the Project.

██ Since Congress has delegated to the Federal Power Commission the authority to license power producing dams which will occupy or affect United States land and land reservations, it is incontrovertible that a Federal Power Commission license is necessary to the construction of the proposed Project by the applicant. The extent of the right which the federal license which has been granted carries or purports to carry, is in issue here.

The aggrieved parties argue that the Commission has no legal power to grant a license unless and until the applicant has shown the Commission that it has complied with all applicable state laws, and they cite instances of conflict between the Project as it is contemplated, and Oregon state law. In support of their contention they cite § 9(b) of the Federal Power Act which reads as follows:

"Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this Act." 41 Stat. 1068.

The application of the quoted section of the Federal Power Act, § 9(b), to the point has been negatived by the Supreme Court in the case of First Iowa Hydro-Electric Coop. v. Federal Power Comm., 1946, 328 U.S. 152, 177, 178, 66 S.Ct. 906, 918, 90 L.Ed. 1143, wherein the court said: "It [§ 9(b) ] does not itself require compliance with any state laws. Its reference to state laws is by way of suggestion to the Federal Power Commission of subjects as to which the Commission may wish some proof submitted to it of the applicant's progress. * * The need for compliance with applicable state laws, if any, arises not from this federal statute but from the effectiveness of the state statutes themselves."

██ We hold that § 9(b) neither enlarges nor limits the Federal Power Commission so far as the authority to grant the application for license is concerned. It specifically gives the Commission the right to ascertain needed information which would affect the Commission's discretion in granting or withholding the license and as to details concerning the Project, its construction, capacity, and desirability.

Our conclusion as to the meaning and effect of § 9(b) does not, however, destroy the objectors' case, for they rely upon the more fundamental claim that the Deschutes River is a state stream and that the State of Oregon has sovereign power over it and its waters.

On the other hand, the applicant for the license and the Commission claim, under the facts of this case, that the Commission's jurisdiction fully includes the power to authorize the construction and operation of the Project and that the Oregon State laws pertaining to dams on the Deschutes River and to the accommodation of anadromous fish in the river and the fact that the Project would greatly damage or ruin the effectiveness of an extensive state fish hatchery, constitute no bar thereto.[10] It is undisputed that

9. We here treat the Indian lands as United States lands since, in the absence of treaty or special Act of Congress to the contrary, the fee title to Indian lands is in the United States subject to their use and occupancy by the Indians. Hynes v. Grimes Packing Co., 1949, 337 U.S. 86, 103, 104, 69 S.Ct. 968, 93 L.Ed. 1231;

St. Marie v. United States, D.C.Cal.1938, 24 F.Supp. 237, 239, 240, affirmed, 9 Cir., 108 F.2d 876.

10. In paragraph (4) of the Commission's "Order issuing License (Major)", which order is in fact the Commission's findings and conclusions, we find the following: "The refusal of the Oregon Fish Commis-

the United States owns the site of the upper or power dam. It does not, however, own the site of the lower dam or all of the land to be flooded by impounded water.

The claimed authority for issuance of the Commission's license is derived from the Federal Power Act and Article IV, § 3, Cl. 2, of the United States Constitution, the latter of which reads as follows:

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; * * *." 11

The Constitutional provision has been given a very broad interpretation by the courts,[12] see United States v. City and County of San Francisco, 1940, 310 U.S. 16, 29, 60 S.Ct. 749, 84 L.Ed. 1050. However, it has limitations. The Supreme Court in Ashwander v. Tennessee Valley Authority, 1936, 297 U.S. 288, 338, 56 S. Ct. 466, 479, 80 L.Ed. 688, in referring to the right of the United States to its own property, said, "The constitutional provision is silent as to the method of disposing of property belonging to the United States. That method, of course, must be an appropriate means of disposition according to the nature of the prop-

erty, it must be one adopted in the public interest as distinguished from private or personal ends, and we may assume that it must be consistent with the foundation principles of our dual system of government and must not be contrived to govern the concerns reserved to the States."

Under the authority of this Constitutional provision, the Congress conferred upon the Federal Power Commission, by § 4(e) of the Federal Power Act, the right to license the construction of hydroelectric plants "upon any part of the public lands and reservations of the United States".

■ The Commission, in its brief, recites the history of federal water power legislation prior to 1920, and traces it into the Federal Power Act of 1920, and deduces therefrom that "[t]he efforts of the Commission were to be 'directed toward a constructive national program of intelligent, economical utilization of our power resources.[13] '" We agree, but the Congress did not and could not change the ownership or control of waters by the adoption of such policy. If the Deschutes River waters were state waters before the adoption of the policy, they remained so after the legislation referred to by the Commission.

We proceed to the question of the sovereign power over the waters of the Deschutes River.

---

sion, acting under an existing law of the State of Oregon, to issue a permit for the Pelton project, is not a bar to the issuance of a Federal Power Act license and to the construction and operation of the proposed project under such license, if that project is found to meet the standards specified for comprehensive water power development in the Federal Power Act."

11. If, in addition to the United States ownership of the proposed dam site, the Deschutes River were navigable, the problem presented by this review would be somewhat similar to that presented to us in State of Washington Dept. of Game v. Federal Power Comm., 9 Cir., 1953, 207 F.2d 391. But the Commission's examiner, in his report to his principal, found the Deschutes River to be non-navigable and that the Project itself

would not involve the subject of interstate commerce. The Commission itself made no conclusions on those subjects, and the Commission's brief claims nothing as to those subjects, and consistently refers to the Deschutes River as being "allegedly non-navigable". In a comparable situation the Supreme Court, in United States v. Cress, 1917, 243 U.S. 316, 318, 37 S.Ct. 380, 381, 61 L.Ed. 746, said: "It may be supposed that Whiteoak creek was not a navigable stream, but there is no finding on the subject."

12. Whether the right of a licensee of the government to use government property is as broad as the government's right to use it, is not raised in the case and we have not considered it.

13. See House Report No. 61, 66th Congress, 1st Session, dated June 24, 1919.

■ Within certain limitations, the sovereignty of the State of Oregon extends over the control of the waters located within the state as definitely as over the lands within its borders. The United States government, however, originally had the control of waters within the public domain which had not been ceded to the states and it has paramount rights in navigable streams under the Commerce clause of the United States Constitution. Art. I, § 8, Cl. 3.

A few generations ago there were large tracts of western lands in the public domain which were arid or semi-arid, but through which streams flowed. Under the doctrine of riparian rights, water could not be appropriated and conducted distances from the streams, and for that reason there was a great waste of water, and the aridity of lands to which water was physically available but to which it could not legally be conducted, was perpetuated. Congress provided the remedy by separating the title to the land from the right to the control of the water and allowed the states, within which such waters flowed, to regulate them. Acts of Congress of 1866,[14] 1870,[15] and the Desert Land Act of 1877.[16]

Most of the states to which such legislation applied, including Oregon, adopted the doctrine of beneficial use and prior appropriation. Oregon early provided that waters of that state belong to the public and cannot be appropriated without the state's consent. Vol. 8 Oregon Compiled Laws Ann. § 116–401 et seq., see California-Oregon Power Co. v. Beaver Portland Cement Co., 1935, 295 U.S. 142, 163, 164, 55 S.Ct. 725, 79 L.Ed. 1356. The Deschutes River flows from and partially through lands to which the Congressional Act applies. The effect of the Desert Land Act of 1877 is thoroughly discussed in Kansas v. Colorado, 1907, 206 U.S. 46, 27 S.Ct. 655, 51 L.Ed. 956.

■ Because of its recent date and the applicability of its expressions, we quote briefly from the opinion in California-Oregon Power Co. v. Beaver Portland Cement Co., supra, 295 U.S. at page 162, 55 S.Ct. at page 731: "As the owner of the public domain, the government possessed the power to dispose of land and water thereon together, or to dispose of them separately. Howell v. Johnson, C.C., 89 F. 556, 558. The fair construction of [the Desert Land Act of 1877] is that Congress intended to establish the rule that for the future the land should be patented separately; and that all nonnavigable waters thereon should be reserved for the use of the public under the laws of the states and territories named. The words that the water of all sources of water supply upon the public lands and not navigable 'shall remain and be held free for the appropriation and use of the public' are not susceptible of any other construction * * *." And again, 295 U.S. at page 163, 55 S.Ct. at page 731 of the same opinion, "Nothing we have said is meant to suggest that the act, as we construe it, has the effect of curtailing the power of the states affected to legislate in respect of waters and water rights as they deem wise in the public interest. What we hold is that following the act of 1877, if not before, all nonnavigable waters then a part of the public domain became *publici juris*, subject to the plenary control of the designated states * * *."

Long before the Supreme Court had spoken in California-Oregon Power Co. v. Beaver Portland Cement Co., supra, Judge Gilbert, speaking for this court in United States v. Hanson, 9 Cir., 1909, 167 F. 881, 884, had occasion to say that "* * [a]lthough the [U.S.] government on admitting a state into the Union relinquishes its control of the disposition of the waters of the state, except in so far as the regulation of commerce is concerned, it relinquishes none of its rights over the public lands included within the territorial limits of the state. The gov-

14. 14 Stat. 251, 253, Title 43 U.S.C.A. § 661.

15. 16 Stat. 217, 218, Title 43 U.S.C.A. § 661.

16. 19 Stat. 377, Title 43 U.S.C.A. § 321.

ernment is still sovereign over such lands, and, in the nature of things, so long as it does not interfere with state legislation over waters of the state, it must have the same power to improve, protect, and offer for settlement or sale the public lands within a territory." In the same opinion at the same page, Judge Gilbert quotes from Kansas v. Colorado, supra, to the same effect.

■ The Commission makes some claim that the anadromous fish in the Deschutes River waters do not belong to the state or that the state has no right over the federal government to legislate in regard to such fish. We disagree. We think the regulation of the river as it flows through the state is one of the powers of the state's sovereignty and includes regulatory powers as to fish in state waters.

■ We fully realize that most of the cases we have cited arose from disputes over the use of water for irrigation and that the cession of the United States of control over waters in or from the public domain to the states was motivated by the Congressional desire to free such waters from the restrictive doctrine of riparian rights so that they could be applied economically to land for irrigation. Nevertheless, the cession was a surrender of all regulatory power over such waters and was not limited to their use in irrigation. Whatever, if any, limitation there was on Oregon's complete sovereignty over the waters of the Deschutes River, was wiped out by the Desert Land Act of 1877.

■ Undoubtedly, the Commission has the legal right to give its *approval* to the Project as a whole. And we do not doubt but that it has the right to grant its *permissive license* to the *construction* of the proposed dam upon its own property. But the Commission has issued no mere permissive license. It has issued a license purporting to grant the complete legal right to the construction and operation of the whole Project. In this, we think, it has exceeded its legal jurisdiction in that the ownership of the power

dam site does not empower the United States government to use the waters of the Deschutes River either at the site of the power dam or elsewhere, contrary to Oregon state law. See State of Iowa v. Federal Power Commission, 8 Cir., 1949, 178 F.2d 421, 427. See, also, Niagara Mohawk Power Corp. v. Federal Power Comm., 1952, 91 U.S.App.D.C. 395, 202 F.2d 190, 207, certiorari granted, 345 U.S. 955, 73 S.Ct. 939, 97 L.Ed. 1376, affirmed 1954, 347 U.S. 239, 74 S.Ct. 487.

Underlying such holding is our opinion that the Commission has trenched upon the sovereignty of the State of Oregon. It is true that the Commission has gone a long way toward minimizing the harm which may result from the construction and operation of the Project, but it has done so, not as a legal requirement, but as a commendable grace which the Commission accords to the State. The fundamental principle, however, is not whether the Project will cause large, small, or any damage. It is that Oregon has the right to regulate its own waters in its own chosen way.

The order issuing the license is set aside.

HEALY, Circuit Judge (dissenting).

I am not able to agree that the Federal Power Commission lacks jurisdiction to license the construction of the proposed hydroelectric plant, nor do I think that in doing so it has trenched upon the sovereignty of the State of Oregon. Commission authority is conferred in § 4(e) of the Federal Power Act to license such projects, not only upon navigable streams, but "upon any part of the public lands and reservations of the United States". And to like effect see § 23(b) of the Act, negativing the right of any person, State, or municipality to undertake such project without Federal license.

The projected power plant would occupy lands of the United States set aside on the west side of the Deschutes River by treaty in 1855 as the Warm Springs Indian Reservation, and lands of the United States abutting the eastern or op-

posite side of the stream. The latter, originally public lands, have from time to time, commencing with the year 1909, been withdrawn from entry or other disposal under the public land laws and reserved for power purposes.[1] Thus the stretch of the Deschutes affected, including its bed and banks, is entirely on reserved lands which have been severed from the public domain and appropriated to a public use.

As my associates appear to recognize, the power of Congress over the use or disposition of the lands of the United States is virtually unlimited and may be exercised in such manner as is consistent with its views of public policy. United States v. California, 332 U.S. 19, 27, 67 S.Ct. 1658, 91 L.Ed. 1889; United States v. City and County of San Francisco, 310 U.S. 16, 29, 60 S.Ct. 749, 84 L.Ed. 1050. Hence to substantiate its claim of control over the use of the waters of the Deschutes River on the lands of the United States involved here, the State of Oregon is under the necessity of showing that Congress by express grant has given it such control. The State undertakes to discharge its burden in this respect by appealing to the Acts of Congress of 1866, 1870 and 1877 [2]; and it is upon the basis of those Acts that the majority of the court has ordered the Commission's license to be set aside.

In my opinion the reliance is wholly misplaced. As is apparent from their wording, these statutes have reference only to streams and other bodies of water on the *public lands*, that is, lands subject to entry or other mode of acquisition under the public land laws.[3] They have no application to waters on reserved lands. That such is the case has been several times affirmed by this court; and the proposition does not appear to have been authoritatively disputed anywhere until now. Witness the following from United States v. McIntire, 9 Cir., 101 F. 2d 650, 654: "Appellees seem to contend that Michel Pablo acquired by prior appropriation the rights in question by local statute or custom, and that the Act of July 26, 1866, 43 U.S.C.A. § 661, requires recognition of those rights. That statute, however, applies only to 'public' lands. [Citing cases.] Lands which are reserved are severed from the public domain. [Citing cases.] The statute mentioned, therefore, does not, we think, apply here." Consult, also, Winters v. United States, 9 Cir., 143 F. 740, a case dealing, as here, with waters of a stream bordering on an Indian reservation. At page 747 of 143 F. of the report we said: "The law is well settled that the doctrine of appropriation under said statutes [referring to the Desert Land Act of 1877], * * * applies only to public lands and waters of the United States. [Giving citations.] And it is equally well settled that, when the lands of the government have been legally appropri-

1. The majority do not discuss these withdrawals, so whether or not they regard them as for any reason ineffective is not ascertainable from their opinion. It is, I think, unquestionable that the power delegated by Congress to the states to control waters of streams on public lands may be recaptured by the Federal government by changing the status of the land to reserved lands. Such withdrawals would be completely effective except to the extent that they impinge upon or interfere with intervening vested rights acquired by persons pursuant to state laws. No such impingement or interference exists or is claimed to exist here.

The intent of Congress to effect withdrawals for power purposes is evidenced by § 24 of the Federal Power Act, reading in pertinent part as follows: "Any lands of the United States included in any proposed project under the provisions of this Part shall from the date of filing of application therefor be reserved from entry, location, or other disposal under the laws of the United States until otherwise directed by the Commission or by Congress."

2. The Acts of 1866 and 1870 are codified together in 43 U.S.C.A. § 661; the Desert Land Act of 1877 is found in 43 U.S. C.A. § 321.

3. Kinney's authoritative work on Irrigation, § 124, states: "The term 'public lands' only embodies such lands as are subject to the sale or other disposition by the United States under general laws. It is a well-settled principle that land once reserved by the government or appropriated for any special purpose ceases to be a part of the public lands, * * *."

ated or reserved for any purpose, they become severed from the public lands, * * *." [4]

Moreover, the petitioners have not shown that the United States has consented to State control of the fishing resources in the waters of the Deschutes on lands of the United States reserved for power purposes or reserved for the Warm Springs Indians. The 1855 treaty with the latter contains a proviso to the following effect: "Provided, also, That the exclusive right of taking fish in the streams running through and bordering on said reservation is hereby secured to said Indians; * * *." 12 Stat. 964. It is thus indisputable that the Indian Tribe, not the State of Oregon, possesses authority, as granted by the treaty, to control fishing resources of the Deschutes bordering on its reservation no less than those in streams entirely within the boundaries of the reservation. As contemplated by § 10(e) of the Federal Power Act, the Warm Springs Indians have given their approval to the Pelton project, hence have consented to the use of their lands for power purposes and to the consequent interference with their exclusive fishing rights.[5]

Although the subject is hardly more than hinted at in the main opinion, the majority would seem to place some re-

liance on the fact that the site of the "re-regulating" dam to be constructed some three miles below the hydroelectric plant is not shown to embrace federally owned or controlled lands. Accordingly it is desirable that this phase of the matter be given brief attention. As the Commission points out, the original Pelton project was to consist of the high dam with the power plant immediately below it. It is this dam and power plant which will necessarily obstruct the seasonal passage of anadromous fish to their spawning grounds upstream, hence the objection interposed by the State and its agencies is to the high dam, not to the re-regulating dam. The latter will provide no power for generation. It was added to the project at the insistence of the State Hydroelectric Commission that the Power Company submit plans for either eliminating or regulating the operational fluctuations of water below the power dam, it being thought by the State Commission that such fluctuations would pose a danger to fishermen or vacationers down stream and would be injurious to fish life. Inasmuch as the Federal Power Commission's order respecting the installation of a re-regulating dam apparently conforms in every way to the State's requirements, there would appear to be no case or controversy here with respect to this portion of its order. Moreover,

4. See also discussion of the limited effect of these statutes in United States v. Walker River Irr. Dist., 9 Cir., 104 F.2d 334, at pages 336 and 337. Among the many authorities there cited and analyzed was United States v. Rio Grande Dam & Irrigation Co., 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136. In its opinion in that case the Supreme Court, among other things, considered the several congressional acts in question saying, 174 U.S. at page 703, 19 S.Ct. at page 775: "Although this power of changing the common-law rule as to streams within its dominion undoubtedly belongs to each state, yet two limitations must be recognized: First, that, in the absence of specific authority from congress a state cannot, by its legislation, destroy the right of the United States, as the owner of lands bordering on a stream, to the continued flow of its waters; so far, at least, as may be necessary for the

beneficial uses of the government property; second, that it is limited by the superior power of the general government to secure the uninterrupted navigability of all navigable streams within the limits of the United States."

5. The majority opinion in footnote 4 quotes a provision of the Act of Congress of August 14, 1848, establishing the territorial government of Oregon, prohibiting dams in streams unless so constructed as to allow salmon to pass freely. What present significance, if any, my associates assign to this provision is not determinable from their opinion. That it can have none is evident, since, to the extent that such Act or any other Federal statutes enacted prior to the Federal Power Act are inconsistent with provisions of the latter, those prior acts are repealed by § 29 of the Power Act providing "That all Acts or parts of Acts inconsistent with this Act are hereby repealed * * *."

it would be wholly out of keeping with the State's desires if we were to declare this portion of the order invalid while upholding the balance. Hence the controversy concerns only the matters already discussed, namely the right of the United States to license the construction of the high dam and the power plant.

It should be borne in mind that the licensing or construction of this hydroelectric project will in no way impinge upon vested rights or interfere with the appropriation, diversion, distribution or use of water of the stream for irrigation or other purposes.[6] The sole grievance as respects the installation is that it will halt the ascent of anadromous fish (here, salmon and steelhead trout) to their spawning grounds on the upper reaches of the Deschutes. It is agreed on all sides that the height of the power dam is such that resort to fishways would be utterly fruitless. Hence the agencies of the State make no complaint on the score of lack of fishways; they seek, rather, to veto the project outright because of its inevitable blocking of the upstream passage of the fish. As my associates are obliged to concede, the Commission has gone to great lengths toward meeting State objections by requiring resort to substitute methods which it believes will be effective. The Power Company is placed under obligation to make extensive contributions, running into many hundreds of thousands of dollars annually, to install facilities for trapping the fish and taking their eggs, and for enlarging the capacity of existing hatcheries, including the Metolius hatchery. As stated in its opinion, the Commission found "no substantial evidence to show that the facilities proposed for conserv-

ing the fish will not maintain existing runs. Moreover, there are indications that the runs can be increased."[7]

But these considerations apart, the First Iowa case 328 U.S. 152, 66 S.Ct. 906, makes it crystal clear that state laws or objections cannot stand as a legal bar to federal authorization of a power project which is within federal competence and which, in the judgment of the Commission, will be in the public interest and will meet the standards specified in the Federal Power Act for comprehensive power development.

---

6. Consult § 27 of the Federal Power Act. The purposes of this section are analyzed by the Supreme Court in the First Iowa case cited in the main opinion, 328 U.S. 152, at pages 175 et seq., 66 S.Ct. at pages 916, 917.

7. The Power Commission found that in recent years the Deschutes has been only a sparse producer of anadromous fish. As a probable reason for the decline in the annual runs as compared with

those of earlier generations, it commented on the effect of the increased irrigation diversions from the upper Deschutes and its two principal tributaries, the Crooked and Metolius Rivers, which enter the main stream above the site of the Pelton project. These diversions appear to have almost completely depleted the waters of these streams in the spawning season and to have depleted also the natural food present in them.