409 F.2d 1122
 ROCKY MOUNTAIN POWER COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent,
Public Service Company of Colorado, Colorado River Water Conservation District, Humble Oil & Refining Company, Public Utilities Commission of the State of Colorado, Intervenors.
 No. 21138.
 United States Court of Appeals District of Columbia Circuit.
 Argued April 22, 1968.
 Decided January 16, 1969.
 
 Mr. Charles F. Brannan, Denver, Colo., with whom Mr. Smith W. Brookhart, Washington, D. C., was on the brief, for petitioner.
 Mr. William H. Arkin, Attorney, Federal Power Commission, with whom Messrs. Richard A. Solomon, General Counsel, Peter H. Schiff, Solicitor, and Drexel D. Journey, Assistant General Counsel, Federal Power Commission, were on the brief, for respondent.
 Mr. Robert L. McCarty, Washington, D. C., with whom Mr. Kenneth Balcomb, Jr., Glenwood Springs, Colo., was on the brief for intervenor Colorado River Water Conservation District, argued on behalf of all intervenors.
 Messrs. Carl Illig, Houston, Tex., Northcutt Ely and C. Emerson Duncan, II, Washington, D. C., were on the brief for intervenor Humble Oil & Refining Company.
 Mr. Robert Lee Kessler, Denver, Colo., was on the brief for intervenor Public Utilities Commission of the State of Colorado.
 Before BASTIAN, Senior Circuit Judge, and LEVENTHAL and ROBINSON, Circuit Judges.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 We have before us a petition to review an order of the Federal Power Commission dismissing an application for authorization to construct and operate hydroelectric facilities. The dismissal stemmed from petitioner's inability, during the more than six years of the application's pendency, to make a satisfactory showing as to the economic and financial feasibility of its project.
 
 
 2
 We have carefully reviewed the record and conclude that it does not sustain the claims of error that petitioner advances. These we now discuss in two phases. The first chronicles the panorama of administrative events giving rise to the controversy here. The second explicates the considerations and principles that lead us to affirm the Commission.
 
 
 3
 * Petitioner filed an application on January 5, 1961, seeking a license to construct and operate a large hydroelectric project on tributaries of the White and Colorado Rivers in northwestern Colorado for the generation and sale for resale of electric energy.[1] Within a month, after initial review of the application, the Commission advised petitioner that it was insufficiently detailed in several major respects, including a showing as to petitioner's ability to finance the project and to market its output. The Commission requested specific information and, on March 17, not having received it, again called petitioner's attention to the deficiencies. A year later, they still remained and on March 30, 1962, the Commission, referring to its earlier communications, warned petitioner of the possible consequences:
 
 
 4
 The Commission has instructed the staff to clear the docket of inactive applications, so that if you do not desire to have the application actively processed at this time, it is suggested that you apply for its withdrawal or the staff will recommend that it be dismissed if the balance of the information requested in its aforesaid letters is not received within 60 days.
 
 
 5
 Petitioner responded on May 4 with materials expanding the project, and stated that an agreement with prospective purchasers was "believed to be imminent." Requesting additional time, petitioner promised that "[i]nformation concerning such agreement will be furnished promptly, together with information necessary to establish the economic feasibility and proposed financial arrangements for completing the project." To this request the Commission acceded.
 
 
 6
 The Commission waited ten months and on March 20, 1963,[2] informed petitioner that it must remedy the deficiencies in its application, then two years old, within 90 days or suffer its dismissal.[3] On the last day of this grace period, petitioner asked for and received a 60-day extension to August 30. Six days before its expiration, petitioner was granted a 90-day extension on representations that negotiations with potential purchasers had produced "an expressed intention" amounting to "commitments" to purchase power from the project.
 
 
 7
 Again the Commission waited, this time for over a half-year, and then, on March 19, 1964, inquired as to the negotiations. Receiving no answer, the Commission inquired again on June 23. Petitioner responded by letter on October 22, asking for a conference with the Commission's staff. The conference was held, and petitioner wrote on November 13 that "[t]here can be no serious question but that a market for this power exists," and that "discussions we have had with responsible financial sources convince [petitioner's president] that as soon as tangible evidence is available that firm contracts for the sale of this power will be concluded, the financing of the project is assured."
 
 
 8
 On May 11, 1965, the Commission wrote that it had received no satisfactory reply to its requests for information as to market and financing plans, and that petitioner's failure to supply it within 30 days would constitute grounds for rejection of its application. Petitioner, on June 10, asked for a nine-month extension, urging that the public interest would be served by its continuing efforts to secure a market.
 
 
 9
 The Commission reacted on August 19 by scheduling a hearing nine months hence, for May 23, 1966. The order designating the hearing directed petitioner to file all its testimony and exhibits by March 1, 1966, including
 
 
 10
 a full and complete statement of a definite plan for the financing of the project, and a full and complete statement of definite plans for the marketing of the electric power to be produced by the project. Failure to comply with this directive will constitute a basis for a motion to dismiss the application for a license for lack of completeness.
 
 
 11
 On the date of the order, various objectants, public and private, were permitted to intervene.
 
 
 12
 At a prehearing conference held on April 12, 1966, petitioner admitted that no contracts for the sale of power had been consummated, and that a financing plan could not be developed prior to such consummation. These developments prompted motions by certain intervenors to dismiss petitioner's application. A Commission order of April 29, however, directing petitioner to resubmit its evidence,[4] forestalled action on the motions, and afforded another opportunity for submission of evidence regarding marketing and financing potentials.
 
 
 13
 At the hearing, and on the basis of petitioner's resubmission, the Commission's staff and a number of the intervenors united in motions for dismissal of the application for lack of a definite plan as to marketing and financing. The hearing examiner found himself unable to "say that the basis for the [August 19th Commission] ruling no longer exists" and so referred the motions to the Commission. On February 16, 1967, on findings that petitioner had not provided sufficient evidence of the project's financial feasibility or a market for its power output, the Commission, one commissioner dissenting, issued an opinion and order dismissing the application without prejudice to refiling at such time as petitioner could provide all of the required information.[5] On a petition for rehearing, the Commission confirmed its action,[6] and the matter then came here for review.
 
 II
 
 14
 The parties are seemingly in agreement on several points that deserve brief mention at the outset. Nobody doubts the Commission's power to require an applicant to submit reasonably adequate information denoting the economic and financial feasibility of his hydroelectric project. It is uncontroverted here that petitioner had been unable to effect any binding arrangement for the sale of the power it wishes to produce. It is also undisputed that petitioner needs outside funding to finance its project. It is clear, too, that such financing depends, among other things, upon petitioner's ability to first secure firm contracts for the sale of the power. At the same time, it is known that there is a potential demand for electric energy in Nebraska and its surrounding states. These circumstances weigh heavily as we consider petitioner's contention that the Commission erred in dismissing its application.[7]
 
 
 15
 The chief factual issue dividing petitioner and the Commission related to petitioner's prospects for securing binding commitments to supply customers in the Nebraska area. The Commission reviewed the evidence in considerable detail and found that petitioner's best chance to obtain a firm contract was with a Nebraska utility, Consumers Public Power District (Consumers). A "memorandum of intentions" between Consumers, petitioner and the latter's affiliated companies recited Consumers' aim to purchase in 1970 additional power above its current requirements. The Commission noted, however, that the memorandum "does not say the purchase will be from the applicant,"[8] and that it provided that there would be "no legal commitment between the parties until they have `negotiated definite contracts.'"[9] The Commission went on to observe that "[i]t does not appear that applicant could furnish power to Consumers by 1970, even assuming it now had a license for the project,"[10] with the result that "Consumers will have to fill its 1970 deficiency from some other source. This would indicate that even [this potential sale] will be lost to applicant."[11] The record also supports the Commission's finding that some or all of the increased demand in Nebraska, the state within which petitioner's best hopes lie, may well be lost to competitors able to market their power quicker.[12]
 
 
 16
 The Commission then proceeded to discuss the potential market for power in states other than Nebraska, the many prospective purchasers with whom petitioner had negotiated to no avail, and petitioner's representation that it had offered power to groups outside Nebraska. As the Commission noted, "[n]othing is said as to the reception given the offers."[13] On this record, given the Commission's expertise in such matters and the deference that it warrants,[14] we cannot say that the Commission was unreasonable in finding that "there has been no showing of a market for this power in Nebraska or elsewhere."[15]
 
 
 17
 Thus over a span of more than six years, petitioner failed to make an adequate showing as to financial arrangements for construction of the proposed hydroelectric facility and as to the availability of a market for its intended product. During this period, the Commission — no less than nine times by letter and once additionally by the order for the hearing — apprised petitioner of the necessity of assembling and presenting concrete plans for accommodation of these needs. Several times petitioner acknowledged the informational deficiencies and represented that they would be rectified within a time certain, and until the matter was designated for hearing, the Commission had consistently honored petitioner's concomitant requests for extensions. And the Commission's communications gave petitioner plain notice that its application was vulnerable to dismissal unless the required showings were forthcoming.
 
 
 18
 We must view the Commission's dismissal action in the light of not only these facts but also of its responsibilities associated with the processing of applications for hydroelectric projects. Such an application can be approved only if "the project * * * shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes * * *."[16] To enable the essential findings, the Commission is empowered to obtain the information needed.[17] To that end, the Commission's regulations require the applicant to supply specified data as to the marketability of the power[18] and the financial arrangements for the necessary construction.[19] The Commission has consistently held that it will not issue a license to an applicant who is unable to adequately show the feasibility of his project, both economically and financially.[20]
 
 
 19
 Petitioner's chief contention in this connection is that although it had no firm prospect for a market or for financing, the Commission acted unreasonably is dismissing its application without prejudice.[21] The case, so the argument runs should have been held in abeyance until either the alleged deficiencies in the application were remedied or it appeared beyond peradventure that petitioner could not remedy them. But by the Commission's appraisal, to let the application further "hang in abeyance * * * would only thwart the administrative process and would be inconsistent with our statutory duties."[22] The Commission pointed out that the dismissal was "without prejudice to the filing of a new application at any time in the the future Applicant believes it can meet the threshold requirements."[23]
 
 
 20
 The Commission has wide discretion in fashioning procedural ground rules which do not impinge on substantive rights.[24] Petitioner was unable to provide the required information during the six-year pendency of its application. The Commission gave clear warnings, and the dismissal was in keeping with its regulations and its precedents in similar cases.[25] In these circumstances, we cannot say that the Commission's disposition of the application was unreasonable.
 
 
 21
 Nor can we accept petitioner's argument that the Commission was obliged to retain the application until such time as evidence might be submitted to demonstrate that no market for petitioner's proposed power is obtainable. Petitioner itself had the burden of meeting the prerequisites for the relief it sought from the Commission.[26] The requirements of the regulations on economic and financial feasibility[27] are explicit, and those regulations are well within the Commission's authority to enforce.[28]
 
 
 22
 Lastly, we reach petitioner's contention that the Commission failed in a duty to consider the application on its merits.[29] But the Commission reasoned, in our view not improperly, that without even a threshold showing of its project's feasibility, "it seems useless to proceed."[30] Because of the application's incompleteness, and thus the impossibility of granting petitioner a license on a deficient record, treatment of other aspects of the case would have wasted the valuable administrative resources of the Commission and the intervening state agencies, and the time and energies of the other participants as well. Moreover, the Commission did not forever deny petitioner a merits consideration for, we reiterate, the application was dismissed without prejudice. By giving petitioner the opportunity to file anew, the Commission left open the possibility of such consideration just as soon as the deficiencies could be remedied.[31]
 
 
 23
 In sustaining the administrative result reached in this case, we do not imply that the Commission may forsake its role as guardian of the public interest.[32] The undisputed fact that the Nebraska area lacks the capability of meeting its future power needs suggested, at least from the viewpoint of a rational exercise of administrative discretion in dismissing petitioner's application, the consideration of possible alternative sources of supply. But the Commission manifested full appreciation of this responsibility, and discharged it in a creditable manner. It acknowledged that it was "incumbent upon us to bear in mind the present and potential needs and supplies of power in Nebraska in disposing of this application."[33] It reviewed other possible new sources of power for Nebraska and concluded that the Nebraska utilities were already planning for their future load demands.[34] As to petitioner's project, however, it pointed out that "despite repeated requests, there has been no showing of a market for this power in Nebraska or elsewhere"[35] and that, in its view, "it would serve no purpose to prolong this proceeding further."[36] It added that "[s]hould a market eventually be found for the power the applicant proposes to make available, no action which we are taking today would prevent the filing of a new application supported by new evidence."[37] Thus, should the day arrive that petitioner can fulfill a meaningful role in supplementation of Nebraska's sparse power resources, the door is wide open to its entry as a new supplier on that market.
 
 
 24
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Petitioner amended its application several times during the course of its administrative consideration, increasing the designed productive capacity of the project from 150,000 to 2,400,000 kilowatts. The engineering and other details of the application and amendments have no bearing upon the issues presented for our decision
 
 
 [2]
 It appears from the record that the only occurrence in the meanwhile was a communication from petitioner informing that a revised application was being prepared for submission
 
 
 [3]
 On March 22, 1963, petitioner filed an amendment to its application which the Commission had requested on May 31, 1962. The previously requested information as to economic and financial feasibility of the project was not included
 
 
 [4]
 The occasion for this order was an objection, sustained by the Commission, that petitioner had disregarded the requirement, specified in the order designating the hearing, that all testimony be in question and answer form and that all exhibits be free of narrative material
 
 
 [5]
 In re Rocky Mountain Power Co., 37 F.P.C. 329 (1967)
 
 
 [6]
 In re Rocky Mountain Power Co., 37 F.P.C. 900 (1967)
 
 
 [7]
 Petitioner complains of the Commission's grant of intervention to numerous objectants, some of whom are intervenors here. We lack jurisdiction to review the grant to intervenors Colorado River Water Conservation District and Humble Oil & Refining Company because the objection as to them was not urged before the Commission in the petition for rehearing. Federal Power Act § 313(b), 16 U.S.C. § 825l(b) (1964). As to intervenor Public Service Company of Colorado, the Commission did not err in granting it limited intervention. Section 308(a) of the Act, 16 U.S.C. § 825g(a) (1964), provides that the Commission
 * * * may admit as a party any interested State, State commission, municipality, or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest.
 Public Service, a public utility that generates and distributes electric energy in Colorado, alleged that because of the vagueness of the proposed market for the sale of petitioner's proposed power, the grant of a license could jeopardize Public Service's traditional market and result in an unnecessary duplication of generating and transmission facilities in the Colorado market area. We cannot say that the Commission was wrong in finding that intervention, limited to the interests alleged in Public Service's petition for intervention, was in the public interest. Nor has error in allowing administrative intervention to remaining objectants been demonstrated. See Juarez Gas Co. v. FPC, 126 U.S.App.D.C. 167, 169-170, 375 F.2d 595, 597-598 (1967); National Coal Ass'n v. FPC, 89 U.S.App. D.C. 135, 139-140, 191 F.2d 462, 466-467, (1951).
 
 
 [8]
 In re Rocky Mountain Power Co.,supra note 5, 37 F.P.C. at 332.
 
 
 [9]
 Id.
 
 
 [10]
 Id.
 
 
 [11]
 Id.
 
 
 [12]
 Id. at 333.
 
 
 [13]
 Id.
 
 
 [14]
 See American Ship Bldg. Co. v. NLRB, 380 U.S. 300, 316, 85 S.Ct. 955, 13 L.Ed. 2d 855 (1965); Whitney Nat. Bank in Jefferson Parish v. Bank of New Orleans & Trust Co., 379 U.S. 411, 420-421, 85 S.Ct. 551, 13 L.Ed.2d 386 (1965); American Union Transport v. United States, 103 U.S.App.D.C. 229, 257 F.2d 607, 612, cert. denied 358 U.S. 828, 79 S.Ct. 46, 3 L.Ed.2d 67 (1958)
 
 
 [15]
 In re Rocky Mountain Power Co.,supra note 5, 37 F.P.C. at 334.
 
 
 [16]
 Federal Power Act § 10(a), 16 U.S.C. § 803(a) (1964)
 
 
 [17]
 Federal Power Act § 9(c), 16 U.S.C. § 802(c) (1964). See also First Iowa Hydro-Electric Cooperative v. FPC, 328 U.S. 152, 168-169, 66 S.Ct. 906, 90 L.Ed. 1143 (1946); Oregon v. FPC, 211 F.2d 347, 351 (9th Cir. 1954), rev'd on other grounds 349 U.S. 435, 75 S.Ct. 832, 99 L.Ed. 1215 (1955)
 
 
 [18]
 "Each application for license for a complete project of more than 2,000 horsepower installed capacity to be constructed, or for a minor part of such project shall * * * set forth in appropriate detail the following information. * * *
 "(i) The proposed use or market for the power to be developed * * * In case the applicant can give no positive assurance that there is or will be a demand for the power upon completion of construction of the project, and that it will be used or distributed by the applicant or sold to others for use or distribution, a full and complete statement and explanation shall be made of the applicant's expectations in this regard and of the basis therefor." 18 C.F.R. § 4.40 (1967).
 Petitioner argues that it came within the last-quoted sentence. But the Commission held, as it reasonably could, that there was no adequate basis for its expectations on product marketability. Moreover petitioner's hopes for financing depended, not on expectations, but on firm marketing contracts.
 
 
 [19]
 "There shall be filed as part of the application for license the following exhibits. * * *
 "Exhibits G. Statement showing the financial ability of the applicant to carry out the project applied for, together with a statement or explanation of the proposed method of financing the construction thereof." 18 C.F.R. § 4.41 (1967).
 
 
 [20]
 See In re Public Utility District No. 1, 32 F.P.C. 444 (1964); In re Robert P. Wilson, 28 F.P.C. 571 (1962); In re Public Power & Water Corp., 12 F.P.C. 197, 199-200 (1953); In re Pacific Gas & Elec. Co., 2 F.P.C. 300 (1940)
 
 
 [21]
 Petitioner on three occasions during the pendency of this appeal, moved for leave to adduce before the Commission additional evidence consisting of five exhibits: (a) a letter from an engineering firm heralding the forthcoming appearance of an engineering and economic study of the feasibility of delivering power produced by petitioner to certain parts of Nebraska; (b) an affidavit by the chairman of the Nebraska Power Review Board concerning the background of the report; (c) the report itself; (d) a certified copy of a contract between Colorado River Water Conservation District and Humble Oil & Refining Company, both intervenors here; and (e) the denial of a petition for certiorari submitted by intervenor Colorado River Water Conservation District in a suit concerning certain water rights not those involved in this case
 Such proffers of evidence are governed by Section 313(b) of the Federal Power Act, 16 U.S.C. § 825l(b) (1964), which provides, in pertinent part, that
 * * * If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. * * *
 The test of materiality, for purposes of this section is strict: does it "clearly appear that the new evidence would compel or persuade to a contrary result * * *." Louisville Gas & Elec. v. FPC, 129 F.2d 126, 134 (6th Cir.), cert. denied 318 U.S. 800, 63 S.Ct. 768, 87 L.Ed. 1164 (1942). We have scrutinized the proffered evidence and conclude that it is not material. Since, however, the Commission's dismissal of petitioner's application was without prejudice, this holding does not foreclose petitioner from using the proffered evidence in another context.
 
 
 [22]
 In re Rocky Mountain Power Co.,supra note 6, 37 F.P.C. at 901.
 
 
 [23]
 Id.
 
 
 [24]
 Federal Power Act § 308, 16 U.S.C. § 825g (1964). Compare Sunray Mid-Continent Oil Co. v. FPC, 364 U.S. 137, 157, 80 S.Ct. 1392, 4 L.Ed.2d 1623 (1960); Pan American Petroleum Corp. v. FPC, 352 F.2d 241 (10th Cir. 1965)
 
 
 [25]
 See note 20,supra.
 
 
 [26]
 Administrative Procedure Act § 7(c), 5 U.S.C. § 556(d) (Supp. II, 1965-66)
 
 
 [27]
 Notes 18-19,supra.
 
 
 [28]
 See Sunray Mid-Continent Oil Co. v. FPC,supra note 24, 364 U.S. at 157, 80 S.Ct. 1392. See also 18 C.F.R. § 4.31 (1967).
 
 
 [29]
 Petitioner relies on Scenic Hudson Preservation Conference v. FPC, 354 F. 2d 608 (2d Cir. 1965), cert. denied 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966), for the proposition that the Commission had an affirmative duty to ascertain whether the project was economically and financially feasible. We understand the central holding in that case to be, rather, that the Commission cannot grant a license for a hydroelectric project without full consideration — on its own initiative, if necessary — of feasible alternative uses of the involved waterway. So much is required by statute, see Federal Power Act § 10(a), 16 U. S.C. § 803(a), and we ourselves have said the same thing. Michigan Consolidated Gas Co. v. FPC, 108 U.S.App.D.C. 409, 429-431, 283 F.2d 204, 224-226, cert. denied 364 U.S. 913, 81 S.Ct. 276, 5 L.Ed.2d 227 (1960). See also City of Pittsburgh v. FPC, 99 U.S.App.D.C. 113, 123 n. 28, 237 F.2d 741, 751 n. 28 (1956). And see Udall v. FPC, 387 U.S. 428, 449, 87 S.Ct. 1712, 18 L.Ed.2d 869 (1967). But we read none of these cases to mean that the Commission must undertake an investigation and demonstration of the viability of every project submitted to it that lacks even a threshold showing that it is feasible
 
 
 [30]
 In re Rocky Mountain Power Co.,supra note 5, 37 F.P.C. at 335.
 
 
 [31]
 The Commission's opinion specified that "[t]his dismissal is without prejudice to any later application which may be made supported by a sufficient showing of financial feasibility and a market for the power."Id. at 336. As the Commission states in the brief filed here, "a refiling of the identical application could be made at any time without leave of the Commission and such action will place the application in substantially the same posture it previously had." We take this to mean that, should petitioner refile, it will not be subjected to the burden of reduplicating material already in the Commission's file.
 It would appear that petitioner would incur no disadvantage by being required to refile, since its now dismissed application conferred no priority. The Federal Power Act offers applicants two routes to licenses. Under Sections 4(e), 6 and 10, 16 U.S.C. §§ 797(e), 799, 803 (1964), one may apply for a license directly. Or, under Sections 4(f) and 5, 16 U.S.C. §§ 797(f), 798 (1964), one may apply first for a preliminary permit and then for a license. A preliminary permit can be obtained without a full showing on project feasibility. The permit offers the applicant the advantage that, during a period of up to three years, he may gather the information needed for a complete license application and then, with a priority over all other applicants, apply for the license itself. Federal Power Act § 5, 16 U.S.C. § 798 (1964).
 Petitioner, having neither applied for nor received a preliminary permit, had no such priority, despite its contention to the contrary. We are informed, however, that intervenor Colorado River Water Conservation District has applied for a preliminary permit for development of a part of the area covered by petitioner's application. Petitioner seeks leave to intervene in that proceeding, and we assume that the Commission will accord it that privilege. See note 7, supra.
 
 
 [32]
 See FCP v. Idaho Power Co., 344 U.S. 17, 23, 73 S.Ct. 85, 97 L.Ed. 15 (1952)
 
 
 [33]
 In re Rocky Mountain Power Co.,supra note 5, 37 F.P.C. at 333.
 
 
 [34]
 Id. at 333 n. 2.
 
 
 [35]
 Id. at 334.
 
 
 [36]
 Id.
 
 
 [37]
 Id.